JOURNAL ENTRY AND OPINION
{¶ 1} In 1974, defendant, Willie Hightower, was convicted of rape, murder in the perpetration of rape, and abduction for immoral purposes. At the time of his conviction, DNA testing was not available. However, since that time, the legislature enacted S.B. No. 11, which allows eligible inmates to file an application for DNA testing. Defendant filed his application, which the trial court denied. Appealing[1] the lower court's denial of his application for DNA testing, defendant states two assignments of error, the first of which follows:
I. The trial court's summary denial of Mr. Hightower's Application for DNA Testing is contrary to law because the trial court did not comply with the requirements of R.C. 2953.73(D). (Journal Entry filed January 27, 2004)
 {¶ 2} An inmate must meet the requirements of R.C.2953.72(C)(1) before applying for DNA testing. Under R.C.2953.72(C)(1) an inmate is determined to be eligible to request DNA testing only if all the following apply:
(a) The offense for which the inmate claims to be an eligible inmate is a felony that was committed prior to the effective date of this section, and the inmate was convicted by a judge or jury of that offense.
(b) The inmate was sentenced to a prison term or sentence of death for the felony described in division "(C)(1)(a) of this section and, on the effective date of this section, is in prison serving that prison term or under that sentence of death.
(c) On the date on which the application is filed, the inmate has at least one year remaining on the prison term described in division (C)(1)(b) of this section, or the inmate is in prison under a sentence of death as described in that division.
(2) An inmate is not an eligible inmate under division (C)(1) of this section regarding any offense to which the inmate pleaded guilty or no contest.
Defendant in the case at bar passed the inmate-eligibility test: he was convicted by a jury, was sentenced to a prison term, and had at least one year remaining when he filed this application; additionally, he is currently serving the prison term for the crimes involved.
 {¶ 3} After an inmate submits an application for DNA testing, the court, pursuant to R.C. 2953.73(D), shall
make the determination as to whether the application should be accepted or rejected. The court shall expedite its review of the application. The court shall make the determination in accordance with the criteria and procedures set forth in sections2953.74 to 2953.81 of the Revised Code and, in making the determination, shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, shall consider all the files and records pertaining to the proceedings against the applicant, including, but not limited to, the indictment, the clerk of the court, and the court reporter's transcript and all responses to the application filed under division (C) of this section by a prosecuting attorney or the attorney general, unless the application and the files and records show the applicant is not entitled to DNA testing, in which case the application may be denied. * * * Upon making its determination, the court shallenter a judgment and order that either accepts or rejects theapplication and that includes within the judgment and order thereasons for the acceptance or rejection as applied to thecriteria and procedures set forth in sections 2953.71 to 2953.81of the Revised Code. * * *. (Emphasis added.)
 {¶ 4} Further, R.C. 2953.76 outlines what the trial court must determine concerning quantity, quality, chain of custody, reliability of parent sample, and findings. Division (C) of this section states in part:
The court shall determine, from the chain of custody of the parent sample of the biological material to be tested and of any test sample extracted from the parent sample and from the totality of circumstances involved, whether the parent sample and the extracted test sample are the same sample as collected and whether there is any reason to believe that they have been tampered with or contaminated since they were collected.
 {¶ 5} This division further states that the court is to make its "determination with reasons and rationale for that determination" after it reviews the state's report regarding the chain of custody and whether or not suitable sample exists.
 {¶ 6} In the case at bar, the state argues that the trial court obeyed the statute when it "provided reasons for its January 27, 2004, decision on March 5, 2004." The state further argues that "no case law exists which directly addresses whether a court's decision is invalid if a court fails to simultaneously include reasons in its decision regarding Applications for DNA Testing. Therefore, defendant's appeal of the decision was premature and, as such, is void." We disagree that the appeal is void.
 {¶ 7} The statute, in its use of the word "shall," places a mandatory requirement upon the court. "As used in statutes, contracts, or the like, this word is generally imperative or mandatory." Black's Law Dictionary, (5 Ed. Rev. 1979) 1233.
 {¶ 8} Here, the trial court made its decision prior to receipt of the state's report. That decision did not follow the procedure mandated by R.C. 2953.76. Because the state had not issued its report for the trial court's review, the denial of defendant's application by the trial court was premature and did not comply with the statute.
 {¶ 9} In addition, the trial court's "Findings of Fact," was filed on March 5, 2004, after defendant filed his first notice of appeal. Neither the appellant nor the state sought leave of this court, however, to supplement the record. Despite this omission from the record in the first appeal, this court may nonetheless reach the merits of this appeal pursuant to App.R. 4(C), which discusses a premature notice of appeal.
 {¶ 10} The premature appeal was addressed in Fultz v. St.Clair, Lake App. No. 2001-L-165, 2002 Ohio 7142, in which appellant filed her notice of appeal two days before the trial court issued its findings of facts and conclusions of law. On appeal, the court determined that the notice of appeal was premature. Relying on App.R. 4(C), however, the appellate court was able to consider the merits of the appeal by deeming the appeal filed as of the date the trial court's findings were journalized.
 {¶ 11} The Fourth Appellate District expanded upon the rule in In re Custody of Shepherd, Scioto App. No. 98 CA 2586, 1999 Ohio App. LEXIS 1238. In Shepherd, an appeal was filed before the trial court determined all the child support issues. Months later, the trial court issued an agreed entry that resolved the entire case. Rather than dismiss the case, the Fourth Appellate District court applying App.R. 4(C) determined that the appeal was premature. The court then treated the case as having been filed as of the date of the trial court's final judgment entry accepting the parties' agreed entry. Id., at *7, fn. 1
 {¶ 12} Here, defendant filed two notices of appeal after the trial court denied his application for DNA testing. The first notice was filed on February 26, 2004, after the trial court denied defendant's application on January 27, 2004. Thereafter, on February 20, 2004, the state filed its "Report Regarding Chain of Custody of Biological Material Submitted Pursuant to R.C.2953.75(B) R.C. 2953.76." On March 5, 2004, the trial court filed the Findings required by R.C. 2953.73(D) and R.C. 2953.76. Defendant's second notice of appeal was subsequently filed on March 26, 2004, Case No. 84398. Included in the record of this second appeal were the court's Findings and the state's report. Both appeals were subsequently consolidated. Therefore, all the mandated documents are now in the record of the case at bar.
 {¶ 13} Following App.R. 4(C) and the case law cited above, we deem the February 26th notice of appeal premature and accept in its place the notice of appeal filed on March 26, 2004, the date of the second notice of appeal.
 {¶ 14} In applying App.R. 4(C) and treating the January 27th notice of appeal as timely, we find no prejudice to either party. Although the court erred in not following the proper procedure, the necessary documents have since been added. Moreover, both parties benefitted by having this case decided on its merits and far more expeditiously than if it were remanded for lack of a final appealable order.[2] See, Gordon v. Gordon,98 Ohio St.3d 334, 2003-Ohio-1069, 784 N.E.2d 1175.
 {¶ 15} Consequently, we conclude the trial court has all the relevant documents and it may proceed to the merits of the case. Because it did not adhere to the mandates of R.C. 2953.73(D), defendant's first assigned error is sustained.
II. The trial court's summary denial of Mr. Hightower's Application for DNA Testing is contrary to law because comparison DNA testing that excludes Mr. Hightower as the source of the available crime scene biomaterial would be outcome determinative. (Journal Entry filed January 27, 2004 and Journal Entry and Findings Made Pursuant to R.C. 2953.74(D) (sic), both filed March 5, 2004).
 {¶ 16} This case depends upon whether to believe Wilson's or defendant's versions of what happened. There was little physical evidence to help resolve this question: the presence of identified sperm in the victim's vagina, defendant's possession of her clothes and wig, and the blanket the victim was wrapped in.
 {¶ 17} How defendant came to possess the victim's clothes and wig is a disputed point. Defendant states that Wilson gave them to him. Defendant's mother testified that was the explanation her son later gave to her.[3] Wilson denies this explanation.
 {¶ 18} The testimony of defense witness, Michael Dotson, undermines Wilson's credibility on the question of these clothes. Dotson testified he had seen Wilson with a coat he had taken from someone and that Wilson carried a gun and admitted he "was sticking up people because his mother didn't get him things * * *." Dotson further stated that Wilson admitted the gun was his mother's and that he and another person held up a lounge with that gun. Tr. at 275.
 {¶ 19} Wilson admitted carrying a gun, but said that defendant had given it to him. Dotson's clear testimony to the contrary about that gun and about Wilson's earlier theft of clothes requires us to question Wilson's credibility, not only about the source of the gun he carried but also about the supplier of the clothes found at the home of defendant's mother. Because defendant explained that Wilson had given him the clothes, defendant's possession of the clothes and wig do not provide an independent basis for believing Wilson over defendant.
 {¶ 20} Nor does the blanket the victim was wrapped in provide that independent basis. Wilson claims he saw that blanket[4] on defendant's bed at his father's house. Defendant's father, on the other hand, denies that blanket was ever in his house. Again, the question of who to believe is unresolved.
 {¶ 21} The presence of sperm, on the other hand, appears to corroborate Wilson's claim that a rape occurred. In fact, in opening statement, the prosecution stated: "* * * we expect the evidence to show that there was semen in the vagina of Cheryl Ann Chambers when she was examined by Dr. Adelson at the morgue. * * * We expect the evidence to show that at that time he [defendant] took her into his home there and raped her."
 {¶ 22} In the hearing on the motion to acquit of rape, the state again focused on evidence of sperm. The state argued that the Coroner's evidence of sperm in the vagina and Wilson's testimony[5] that defendant said he raped the victim constituted a prima facie case. Tr. 257-8. The state's reliance on the semen being found in the victim's body puts the DNA evidence squarely before the court.
 {¶ 23} The prosecution's response to the DNA request is that rape is possible without ejaculation. This response is a new argument. R.C. 2953.74(B), the statute controlling the DNA request, looks to the "trial stage" in the case. At the time of the trial, the prosecution made the presence of semen central to its evidence. Indeed, the prosecution singled out, specifically, evidence of sperm in the vagina and Wilson's testimony as the basis for its prima facie case. Reporting the presence of semen in the victim's vagina was the major contribution of the coroner's testimony:[6] only the coroner could report the presence of semen in the victim's vagina. Calling the coroner to testify is further proof that the report of semen was crucial.
 {¶ 24} The coroner further testified that there was no evidence of sexual violence, indeed no physical violence other than the strangulation. Thus the report of semen was essential to corroborate Wilson's claim that a rape had occurred. Wilson could not have survived any credibility test without this evidence. Except for the presence of sperm, there was no physical evidence that sexual intercourse had even occurred.
 {¶ 25} The state observed that the body was found in a car "near the home" of defendant. The car was found, however, in the parking lot of the same apartment complex where Wilson lived with his mother.[7] The location of the victim's car almost equidistant to both the defendant's and witness's homes metaphorically represents the balance of evidence in this case.
 {¶ 26} Challenging Wilson's allegations, on the other hand, is defendant's alibi the night in question. Defendant's father testified that when it was getting dark they had gone together to a store to purchase a car part,[8] worked on a car, had dinner, and came home, and then the son played the guitar. The father further testified that his son did not leave the house that night. The father explained that because of the arrangement of rooms, his son could not have left the house without the father seeing him.
 {¶ 27} To buttress Wilson's claims, some physical evidence was necessary. Evidence of sperm in the victim's vagina provided that support. A DNA report showing that the sperm was not defendant's, on the other hand, would have left substantial doubt about Wilson's claims.
 {¶ 28} The statute authorizing DNA testing requires that the results of the DNA test be "outcome determinative." The statute also defines this phrase:
"Outcome determinative" means that had the results of DNA testing been presented at the trial of the subject inmate requesting DNA testing * * *, no reasonable factfinder would have found the inmate guilty of that offense * * *.
R.C. 2953.21(L).
 {¶ 29} The prior history of this case confirms that the margin of evidence by which defendant was convicted was extremely narrow. A prior jury acquitted defendant of first-degree murder and was unable to return a verdict on the charges of rape, murder in the perpetration of rape, and abduction for immoral purposes — the same charges of which he was found guilty in the second trial. Clarifying that the sperm was not defendant's would have firmly established reasonable doubt that defendant raped the victim — a reasonable doubt that the first jury, in fact, had. Because of the paucity of evidence that did not depend upon the testimony of Wilson, no reasonable factfinder would have found the evidence beyond a reasonable doubt that defendant had committed rape, if a DNA test proved the sperm was not defendant's. Accordingly, the judgment of the trial court denying defendant's application is reversed. We, therefore, grant defendant's application for the DNA test and remand this case for proceedings consistent with this opinion.
Judgment accordingly.
This cause is reversed and remanded.
It is, therefore, ordered that appellant recover of appellee his costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Blackmon, A.J., and Calabrese, Jr., J., Concur.
[1] This appeal is a consolidation of Cuyahoga County Court of Appeals Case Nos. 84248 and 84398.
[2] We also reject the state's characterization of an appeal for DNA testing as a post-conviction petition. A DNA application is too specific a statutory creation and too unique to be pushed into such a tight box.
[3] The state discounts this explanation because the son gave it to his mother after his arrest. There is no evidence, however, that anyone asked the origin of the clothes any earlier.
[4] In his application for DNA testing, defendant had also requested that the blanket be tested. The Court Reporter, however, has been unable to find this exhibit (Exhibit 3).
[5] Wilson has since recanted his testimony. Moreover, he is on death row in the State of Kentucky for rape/robbery/murder of a woman he abducted at gunpoint and forced back into her car, where he raped and strangled her. As in the case at bar, Wilson accused someone else of the crime. Wilson v. Commonwealth, Ky. (1992), 836 S.W.3d 872, cert. denied, (1993), 507 U.S. 1034, overruled in part on other grounds by St. Clair v. Roark (Ky, 1999),10 S.W.3d 482.
[6] The coroner also testified that the victim died by strangulation — a fact not in dispute.
[7] Wilson lived with his mother at 7727 Garden Valley. The victim's father stated the car was found in a parking lot at the Garden Valley Estates.
[8] Receipts were entered into evidence to support father's assertion that he and his son went out to purchase a car part. The Court Reporter, however, was not able to produce these exhibits (Exhibits C and D). Tr. 340.