DECISION AND JUDGMENT ENTRY
{¶ 1} Martin L. Hatton appeals the trial court's judgment denying his application for DNA testing pursuant to R.C. 2953.71
to 2953.81. He contends that the trial court erred by determining that exclusion DNA results would not be "outcome determinative." Because DNA evidence was not the crux of the state's case and because substantial circumstantial evidence supports Hatton's conviction, including his co-defendant's statements implicating him, exclusion DNA results would not be "outcome determinative." Thus, the trial court did not err by denying Hatton's application.
 {¶ 2} Hatton additionally asserts that the trial court's decision denying him access to the biological specimens violatesBrady v. Maryland (1963), 373 U.S. 83, 87, 83 S.Ct. 1194,10 L.Ed.2d 215. Hatton had access to the specimens during the jury trial proceedings. Additionally, we previously determined, both in Hatton's direct appeal and in his appeal of the denial of his postconviction petition, that the state did not fail to disclose exculpatory evidence. Thus, Hatton's argument is without merit. Accordingly, we affirm the trial court's judgment.
 I. {¶ 3} On January 18, 1997, at approximately 1:17 a.m., seventeen year old Jillian Combs awoke to the sound of footsteps in her bedroom.[1] Shortly thereafter, Jillian felt a gloved hand covering her mouth and saw a strange man's face inches away from her. The man held a knife to Jillian's neck and told her that she "better really love [her] parents, that if [she] screamed or made any noise he was going to kill" her family. The man raped Jillian in her bedroom and then took her downstairs to the family room. Once downstairs in the family room, a second man raped Jillian. While the second man was raping Jillian, the first man left the room. When the first man came back, he told the second man that they had to leave. The second man stated that he was not ready to leave because he was "not done" with Jillian.
 {¶ 4} Jillian and the two men heard footsteps upstairs. Jillian's father, Paul, hearing footsteps in the house, had woken up to investigate. As he proceeded down the stairs, he heard someone say, "Let's get the hell out of here. Someone's coming." Paul saw the first man fleeing the residence. The second man ran into Paul. The two men struggled. During the struggle, the second man was yelling, "Marty, Marty, Marty!" He told Paul, "My buddy's got a gun, he will come in and kill you all." Paul asked the second man who Marty is, and the man replied, "I don't know why I am here. I came with Marty Hatton."
 {¶ 5} As Paul was struggling with the second man, Jillian ran upstairs to her parents' bedroom to find her mother. Jillian told her mother what happened and telephoned 911.
 {¶ 6} Circleville Police Sergeant Wayne Gray and Circleville Police Officer David Haynes were the first officers on the scene. As Sergeant Gray entered the front door, he saw Paul standing over the second man, who was laying on the floor and was yelling, "Where's Marty?" The second man said several times that he had been at the residence with "Marty." Sergeant Gray told the man that he did not know who "Marty" was. The second man stated it was "Marty Hatton." The officers learned that the second man was Ricky Dunn. The officers arrested Dunn and, when additional officers arrived on the scene, began searching for Hatton. The officers did not, however, find Hatton.
 {¶ 7} Following his arrest and at trial, Dunn explained the events surrounding the burglary and rape as follows. Dunn testified that he was with Hatton on the night of January 17, 1997, and they went to the Match Box Tavern. After leaving the bar, Dunn and Hatton went to Chatham Drive. Hatton told Dunn they were going to Chatham Drive to talk to one of his friends. When they got to Chatham Drive, Hatton told Dunn that he was going to rob a house. Dunn stated that he thought Hatton was kidding. Hatton told Dunn that "he would leave [Dunn] laying on the ground if [Dunn] didn't do it." Hatton and Dunn went to one house, but could not open the door. They then went to the next house and walked around the side entrance to the garage. Hatton opened the door with a credit card. Hatton and Dunn entered the garage and Hatton began looking through the cars. Hatton found a set of keys in one of the cars.
 {¶ 8} Hatton then entered the house while Dunn remained in the garage. Some time later, Hatton returned to the garage and told Dunn to come inside. When Dunn entered the house, he saw Jillian standing against the wall. Dunn said Marty was laughing, stating, "Look at this, * * * seventeen years old." Dunn told Hatton, "Oh, no, don't do this. Let's get out of here." Dunn stated Hatton would not listen to him.
 {¶ 9} Hatton told Dunn that he had sex with Jillian and that Dunn was also going to have sex with her. Dunn told Hatton, "no way, I am not going to do that." Dunn again told Hatton that they should leave. Hatton grabbed Jillian, held the knife to her neck and said if Dunn did not have sex with her, Hatton would kill her.
 {¶ 10} Hatton led Jillian into the family room and told Jillian to lay down on the couch. He told Dunn to get on top of her. Hatton held the knife to Jillian's neck and told her not to make any noise. Hatton shone a flashlight on Jillian and Dunn to make sure that Dunn was having sex with her. Dunn stated that he was not able to have sex with her because he was scared. Approximately five minutes later, Dunn heard someone coming downstairs. Hatton said, "Let's get the hell out of here, somebody is coming." Dunn replied, "I am not ready yet." Dunn stated he did not want to leave with Hatton because he was afraid Hatton would kill him and Jillian. Dunn later informed the officers that Hatton had been wearing a dark colored sweatshirt on the night in question.
 {¶ 11} The next day Circleville Police Officer Kevin Clark and Pickaway County Sheriff's Department Sergeant Mike Wears went to Hatton's house to question him about his whereabouts during the preceding night and about Dunn's allegations. The officers informed him that Dunn had stated that he had been involved in a burglary and a rape at the Chatham Drive residence during the overnight hours. Hatton told the officers that he had no idea what the officers were talking about. Hatton stated that he had not seen Dunn the previous evening. Hatton stated that on the previous evening, he returned home shortly before midnight, watched a movie with his wife, and went to bed.
 {¶ 12} Hatton informed the officers that he was willing to help out in any way that he could and that he was not involved in the crimes. The officers asked him for the clothes he had been wearing the previous evening, and he gave them a pair of jeans, a sweater, a shirt, and a pair of underwear. Hatton did not turn over the dark colored sweatshirt that Dunn claimed he wore. The officers also asked Hatton to accompany them to the police station for a line-up.
 {¶ 13} At the police station, Hatton voluntarily participated in a line-up. The victim could not, however, identify the perpetrator. Officer Clark then took Hatton into an interview room. Officer Clark wanted to ask Hatton some questions about Dunn's allegations, but Hatton stated that he wanted to speak with an attorney. Officer Clark stated that the officers had discovered that Hatton was in Laurelville with Dunn on the night in question. Hatton stated that he was in Laurelville. Hatton stated that he wanted to help clear his name and that he did not do anything wrong.
 {¶ 14} Hatton asked Officer Clark what he could do to clear his name. Officer Clark stated that the police would need blood and pubic hair samples, and that they would need to search his house. He agreed to provide the samples and to let the police search his house.
 {¶ 15} During the search of Hatton's home, the officers took a dark colored sweatshirt from the closet located in the master bedroom. The sweatshirt had a dried white substance on it which the officers suspected to be semen. Hatton's wife confirmed that Hatton had been wearing the sweatshirt on the night in question.
 {¶ 16} When Raman Tejwani, a DNA analyst with the Columbus Crime Lab, analyzed the swabs and the underwear, she determined that the semen came from more than one male contributor, but she was not able to exclude or include Hatton as a contributor. Tejwani also stated that her analysis of the semen stained sweatshirt was inconclusive because the sample did not contain enough DNA.
 {¶ 17} In his defense, Hatton presented the testimony of Larry M. Dehus, a forensic scientist. Dehus testified that he examined Hatton's pubic hair sample and discovered a foreign pubic hair. Dehus stated that he microscopically compared the foreign pubic hair to Jillian's pubic hair and, unlike the state's expert, concluded that the two were dissimilar. Dehus further stated that the state's expert's report did not account for a black pubic hair that was discovered. Dehus stated that an examination of the black pubic hair could have determined whether the hair was similar to Jillian's, or whether the hair was similar to either Hatton or Dunn. Dehus also stated that from reviewing CCL's DNA analysis reports, it appeared to him that a third individual contributed to the semen samples.
 {¶ 18} On June 5, 1997, a jury found Hatton guilty of aggravated burglary, kidnapping, felonious assault, rape, and theft. On July 29, 1997, the trial court sentenced appellant. Appellant appealed the trial court's judgment of conviction and sentence, raising six assignments of error. We found no merit to appellant's assignments of error and affirmed the trial court's judgment. See State v. Hatton (Apr. 19, 1999), Pickaway App. No. 97CA34.
 {¶ 19} On June 12, 1998, during the pendency of his direct appeal, Hatton filed a petition for postconviction relief claiming that his convictions and sentences are void or voidable. The trial court denied his petition, and we affirmed its judgment. See State v. Hatton (Aug. 4, 2000), Pickaway App. No. 00CA10.
 {¶ 20} On February 3, 2005, Hatton filed a motion requesting the court to order the release of all evidence susceptible to DNA testing. Hatton asserted that he wished to have a newer DNA test performed, the "Y-chromosome short tandem repeat tests (`Y-STRs')." He claimed that the analysis of Y-STRs enables one to identify only male DNA in a sample containing a mixture of male and female DNA. He argued that the results of this test would be "outcome determinative" because it would show that his DNA was not present on any of the samples, and, thus, that he was not involved in the crimes.
 {¶ 21} On November 10, 2005, the court denied Hatton's request for DNA testing. It noted that he did not request state testing but asserted that he would pay for an out-of-state lab to perform the test, even though he is indigent. The court determined that new tests results would not be "outcome determinative," explaining:
"The case against Mr. Hatton was presented to a jury without any forensic evidence affirmatively linking him to the crimes. The expert witnesses all testified that the DNA evidence was inconclusive. There was also testimony that a black pubic hair was found on the victim and that the Defendant's pubic hair was reddish blond in color. One of the Defendant's expert witnesses opined to the jury that it appeared to him that a third individual contributed to the semen samples. The jury heard all of this evidence and still returned a guilty verdict.
After a thorough review of Defendant's entire file, this Court finds that even if `new and improved' DNA testing would conclusively exclude the Defendant as a `donor,' a reasonable jury could still find the Defendant guilty of the charges set forth in the indictment. A reasonable jury could come to this conclusion based solely upon circumstantial evidence and testimony of the other witnesses."
 {¶ 22} Hatton timely appealed and raises the following assignments of error: "I. The lower court erred as a matter of law and as a matter of fact, and misapplied R.C. 2953.71 to2953.83 in denying Appellant's application for DNA testing, where Appellant adequately demonstrated that the results of exclusionary DNA testing would have been outcome determinative at trial." "II. The lower court erred in denying the Appellant's application for DNA testing where Due Process requires the State to provide the Appellant with any exculpatory evidence that is material to guilt or innocence."
 II. {¶ 23} In his first assignment of error, Hatton asserts that the trial court erred by denying his application for DNA testing. He claims that he showed that the results of DNA testing would have been "outcome determinative" at trial. Hatton recognizes that circumstantial evidence implicates him but contends that "circumstantial evidence is often unreliable and imprecise, particularly when countered by DNA or other conclusive, scientific evidence."
 {¶ 24} The state first asserts that Hatton requests a remedy that the statute does not provide. He requests the court to release the evidence to him for testing in an out-of-state facility rather than to have the State of Ohio perform the testing. Second, the state contends that Hatton cannot show that the new test results would be outcome determinative because substantial circumstantial evidence supports his conviction. The state notes that at trial: (1) Hatton's expert opined that a third individual contributed to the semen samples; (2) Hatton's co-defendant implicated Hatton; (3) the evidence showed that Hatton attempted to mislead the police by agreeing to cooperate but by giving them the wrong clothing to test and by stating that he had not been with Dunn the previous evening; and (4) Hatton stated to another individual that he "was at the wrong place at the wrong time."
 A. Standard of Review {¶ 25} As the parties correctly observe, the standard of review for a trial court's decision regarding an application for DNA testing is unsettled. Hatton requests that we review the court's decision de novo, while the state asserts that we use the abuse-of-discretion standard of review. The state further asserts that under either standard, the trial court's judgment is correct.
 {¶ 26} Some courts have reviewed the trial court's decision regarding an application for DNA testing de novo,[2] while one has employed an abuse-of-discretion standard of review.[3] We choose not to directly resolve the issue but instead will use, for the sake of argument, the more stringent standard of review — de novo.
 B. Application for DNA Testing {¶ 27} R.C. 2953.74(A) provides: "If an eligible inmate files an application for DNA testing and a prior inconclusive DNA test has been conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall review the application and has the discretion, on a case-by-case basis, to either accept or reject the application."
 {¶ 28} R.C. 2953.74(B) specifies the circumstances that must exist before the court may grant an application for DNA testing.
(B) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:
* * *
(2) The inmate had a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, the test was not a prior definitive DNA test that is subject to division (A) of this section, and the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case.
 {¶ 29} In the case at bar, the state and Hatton dispute whether DNA testing results would be "outcome determinative." R.C. 2953.71(L) defines "outcome determinative" to mean that "had the results of DNA testing been presented at the trial of the subject inmate requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the inmate is an eligible inmate and is requesting the DNA testing * * *, no reasonable factfinder would have found the inmate guilty of that offense * * *."
 {¶ 30} In State v. McCall, Muskingum App. No. CT2005-6,2006-Ohio-225, the court determined that exclusion DNA test results[4] would not be outcome determinative. In McCall,
the defendant had been convicted of aggravated robbery and robbery. After his conviction, he requested DNA testing of a white ball cap and a gray t-shirt that the perpetrator allegedly wore when committing the crime. He claimed that because he presented an alibi defense at trial, if the DNA on the items did not belong to him, then the jury may not have convicted him. The trial court found that the DNA results would not be outcome determinative and the court of appeals agreed. The appellate court noted:
"[T]here were multiple eyewitnesses to the robbery. Eyewitnesses testified that the robber was wearing a gray sweatshirt and a white baseball cap. Police officers recovered those items from a dumpster in the vicinity of the BP Station. The State presented those items at trial. The State never tested those items for DNA and did not use any DNA evidence against the [defendant]. Even if testing would prove that it was not the [defendant]'s DNA on those items, an `exclusive result' would not have been `outcome determinative.' Both Jim Ford and Nathan Barnhart positively identified [defendant] as the robber. Connie Tolliver, who considered herself a friend of [defendant], identified [him] as the individual fleeing from the robbery. Several eyewitnesses also identified the vehicle [defendant] was driving as he fled from the robbery. That vehicle was later determined to belong to * * * [defendant]'s wife."
 {¶ 31} The court thus determined that the defendant's conviction "was primarily based upon eyewitness testimony by witnesses who claimed they saw [the defendant], not the clothes" he allegedly wore.
 {¶ 32} In State v. Wilkins, 163 Ohio App.3d 576,2005-Ohio-5193, 839 N.E.2d 457, appeal allowed,108 Ohio St.3d 1436, 2006-Ohio-421, 842 N.E.2d 62, the court determined that exclusion DNA test results would not be outcome determinative. InWilkins, the defendant was convicted of raping his cousin. The court agreed with the trial court that an exclusion result from DNA testing of the semen taken from the cervical swab would not be outcome determinative of the defendant's guilt. The court noted that: (1) the victim stated that she was unsure if the defendant ejaculated during the rape; and (2) the victim had intercourse with her boyfriend about three or four days before the alleged rape and semen can remain in the vaginal cavity for up to four days. The court stated that: "Ejaculation is not a required element of rape, and therefore, even if the semen from the cervical swab did not match defendant, a reasonable factfinder could still come to the conclusion that defendant had raped [the victim]." Id. at ¶ 13.
 {¶ 33} Wilkins distinguished State v. Hightower, Cuyahoga App. Nos. 84248 and 84398, 2005-Ohio-3857, which the parties refer to in the case at bar:
"In State v. Hightower, Cuyahoga App. Nos. 84248 and 84398,2005-Ohio-3857, the Eighth Appellate District also faced the argument that a DNA test would not be conclusive because rape may occur without ejaculation. In resolving this issue, the Eighth District turned to R.C. 2953.74(B), the statute controlling the DNA-test request, to see how central the DNA evidence was to the prosecution's case at the trial court level. The court found that the prosecution in Hightower had made the presence of semen central to its case and had singled out the specific evidence of sperm in the vagina and the testimony of another witness, who was not the victim, to corroborate that a rape had occurred as the basis for its prima facie case. The court found:
`To buttress [the witness'] claims, some physical evidence was necessary. Evidence of sperm in the victim's vagina provided that support. A DNA report showing that the sperm was not defendant's, on the other hand, would have left substantial doubt about [the witness'] claims.' Id. at ¶ 27.
The Eighth District Court noted that the prior history of the case confirmed that the margin of evidence by which Hightower was convicted was extremely narrow and that a prior jury had been unable to return a verdict on the charges of rape. The court concluded that the scarcity of evidence meant that `no reasonable factfinder would have found the evidence beyond a reasonable doubt that the defendant committed rape, if a DNA test proved the sperm was not the defendant's.' Id. at ¶ 29.
We do not find such a narrow margin of evidence in this case, nor do we find that the prosecution made the evidence of DNA on the cervical swab central to its case. While the state did call the physician who performed the rape protocol exam and the BCI lab technician, it also called five other witnesses, including [the victim]. There were also other physical injuries to [the victim], which the emergency room physician testified to, including abrasions on her face and puncture wounds on her right hand, which had already begun to show signs of infection from a human bite. Further trace evidence of pubic hairs, fibers, and other DNA samples were not found, possibly because [the victim] had showered after the assault."
Id. at ¶¶ 15-16.
 {¶ 34} In the case at bar, we agree with the trial court's conclusion that exclusion DNA test results would not be outcome determinative. Unlike Hightower, the state did not rely exclusively upon DNA evidence to prove its case. As the trial court explained: "The expert witnesses all testified that the DNA evidence was inconclusive. There was also testimony that a black pubic hair was found on the victim and that the Defendant's pubic hair was reddish blond in color. One of the Defendant's expert witnesses opined to the jury that it appeared to him that a third individual contributed to the semen samples. The jury heard all of this evidence and still returned a guilty verdict." Instead of relying upon DNA evidence, the state relied upon Dunn's testimony implicating Hatton, Hatton's statement to a third individual regarding being in the wrong place at the wrong time, and Hatton's misleading of police officers. See, also, State v.Combs, 162 Ohio App.3d 706, 2005-Ohio-4211, 834 N.E.2d 869, at
¶ 32 ("Even if DNA testing excluded the victim as the source of the blood on appellant's sock, a reasonable jury could still find appellant guilty of the charges set forth in the indictment. A reasonable jury could come to this conclusion based solely upon circumstantial evidence, appellant's confession, and testimony of the other witnesses.").
 {¶ 35} Moreover, as both Wilkins and Hightower note, the presence of semen, or ejaculation, is not an element of rape. Even if DNA test results excluded Hatton as a contributor to the semen specimen, a reasonable jury could still conclude that Hatton raped the victim but that he did not ejaculate or leave semen.
 {¶ 36} Accordingly, we overrule Hatton's first assignment of error.
 III. {¶ 37} In his second assignment of error, Hatton argues that the trial court's decision violates the Due Process Clauses of the United States and Ohio Constitutions. He claims that the trial court, by failing to order the state to produce the DNA specimens, violated the rule set forth in Brady v. Maryland
(1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215, which requires the state to disclose exculpatory evidence.
 {¶ 38} In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 1196-1197. "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v. Johnston (1988), 39 Ohio St.3d 48,529 N.E.2d 898, paragraph five of the syllabus, following UnitedStates v. Bagley [1985], 473 U.S. 667, 105 S.Ct. 3375,87 L.Ed.2d 481. The defense bears the burden of proving that the state suppressed material, exculpatory evidence. State v.Jackson (1991), 57 Ohio St.3d 29, 33, 565 N.E.2d 549.
 {¶ 39} In the case at bar, the trial court's decision does not violate Brady. Hatton previously had access to the evidence during the trial court proceedings, and we have already twice determined that the state did not improperly suppress exculpatory evidence. Moreover, the legislature has prescribed the procedure for an eligible inmate to apply for postconviction DNA testing. The trial court simply followed the statutory procedure for reviewing such an application and determined that Hatton failed to satisfy either of the two criteria that would permit it to grant his application. Additionally, we note that Hatton has not directly challenged the procedure's constitutionality. Accordingly, we overrule Hatton's second assignment of error and affirm the court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.
[1] We take the above facts from our prior opinion regarding Hatton's direct appeal and quote liberally from it. See State v.Hatton (Apr. 19, 1999), Pickaway App. No. 97CA34.
[2] See State v. Lemke, Columbiana App. No. 05CO42,2006-Ohio-3481; State v. Wilkins, 163 Ohio App.3d 576,2005-Ohio-5193, ¶ 6; see, also, State v. McCall, Muskingum App. No. CT20056-, 2006-Ohio-225 (seeming to apply a de novo standard of review without expressly stating so).
[3] See State v. Hayden, Montgomery App. No. 20747,2005-Ohio-4025; see, also, R.C. 2953.74(A) (stating that the court "has the discretion" to grant or deny the application).
[4] R.C. 2953.71(G) defines "exclusion" or "exclusion result" to mean "a result of DNA testing that scientifically precludes or forecloses the subject inmate as a contributor of biological material recovered from the crime scene or victim in question, in relation to the offense for which the inmate is an eligible inmate and for which the sentence of death or prison term was imposed upon the inmate or, regarding a request for DNA testing made under section 2953.82 of the Revised Code, in relation to the offense for which the inmate made the request and for which the sentence of death or prison term was imposed upon the inmate."