[Cite as *State v. Scott*, **2020-Ohio-5302**.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-01-007 |
| | : | O P I N I O N |
| - vs - | | 11/16/2020 |
| | : | |
| GUY BILLY LEE SCOTT, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR1991-11-0947

Martin P. Votel, Preble County Prosecuting Attorney, 101 East Main Street, 1st Floor, Eaton, Ohio 45320, for appellee

Ohio Innocence Project, Mallorie Thomas, Donald Caster, University of Cincinnati College of Law, P.O. Box 210040, Cincinnati, Ohio 45221, for appellant

**PIPER, J.**

{¶1}  Guy Billy Lee Scott appeals from the decision of the Butler County Court of Common Pleas, which denied his petition for postconviction DNA testing.  For the reasons that follow, this court affirms the decision.

{¶2}  In 1992, a Butler County jury convicted Scott for the murder, rape, and assault of Lesa Buckley.  This court summarized the facts of the case in Scott's direct appeal:

[O]n July 8, 1990 Lesa Buckley's body was discovered by appellant floating in Cedar Lake near New Paris, Ohio. An autopsy revealed that Lesa had been brutally beaten by fists and a hard object to the point that she was rendered unconscious. She had also been anally penetrated and sexually assaulted. Eventually, Lesa was dragged feet first into the water where she drowned.

An investigation by New Paris police revealed that the night before Lesa was killed she attended a party at Cedar Lake where appellant and about eighty other people were celebrating a friend's birthday. The investigation further revealed that several people noticed appellant and Lesa were missing from the party at the same time. Later in the evening, appellant returned to the party wet; Lesa was never seen alive again.

New Paris police officers also gathered information that Tony Young, who testified at trial for the state, had seen Lesa and appellant engaged in sexual activity in the grass by the lake. Furthermore, over the course of the next several months, police officers learned that appellant had admitted, on several occasions, that he killed Lesa.

*State v. Scott*, 12th Dist. Butler No. CA92-03-052, 1994 WL 394976, *1 (Aug. 1, 1994).

{¶3} This court affirmed Scott's convictions and overruled 17 assignments of error, including assignments of error challenging the sufficiency and weight of the evidence used to convict him. *Id.* at *3. Scott later petitioned for postconviction relief, which petition the common pleas court denied. This court also affirmed that decision. *State v. Scott*, 12th Dist. Butler Nos. CA96-12-254 and CA97-04-086, 1997 WL 632875 (Oct. 13, 1997). Scott appealed both of this court's decisions to the Ohio Supreme Court, which declined to review either. *See Id.* at 71 Ohio St.3d 1428 (1994); and 81 Ohio St.3d 1428 (1998).

{¶4} In April 2019, Scott petitioned for postconviction DNA testing. Scott stated that the coroner had collected a rape kit and fingernail scrapings from Buckley, which had not been DNA tested. Scott alleged that he was statutorily entitled to postconviction DNA testing of those materials because a DNA test that excluded him as a potential contributor would be "outcome determinative" as required by R.C. 2953.74(C)(4) and (5). Scott

principally argued that the case against him was based on eyewitness testimony and circumstantial evidence and thus any DNA test excluding him would be persuasive evidence that he did not kill Buckley. Scott also argued that Tony Young had since twice recanted his trial testimony, and now claimed that he gave false testimony as part of a scheme to convict Scott of Buckley's death.

{¶5} In opposing Scott's motion, the state argued that a DNA exclusion result would not be outcome determinative because, given the testimony and circumstantial evidence presented against Scott, there was not a strong probability that no reasonable factfinder would have found Scott guilty. The state also challenged the credibility of Young's recantations.

{¶6} The court denied Scott's application in a written decision. The court indicated that it had reviewed all written arguments, the supporting affidavit, the documentary evidence, procedural history, and documents in the case, and had also considered oral arguments presented to the court.

{¶7} In its decision, the court noted the following evidence. Scott was observed alone with Buckley engaged in sexual activity near where her body was later found. Scott and Buckley were both missing from the party at the same time and Scott later returned to the party wet. Scott provided different explanations of why he was wet. Scott admitted to another witness to have engaged Buckley in sexual intercourse. Scott was able to identify Buckley's body floating in the lake despite bloating and deformity to the body. Scott instructed another witness to destroy potential evidence after finding Buckley's body. The court also highlighted the multiple occasions following Buckley's death when Scott confessed or made statements implicating himself in her murder. The court found that in light of the "overwhelming" evidence, a DNA exclusion would not establish a strong probability that no reasonable juror would have found Scott guilty. Scott appeals, raising

- 3 -

two assignments of error.

{¶8}   Assignment of Error No. 1

{¶9}   THE TRIAL COURT ERRED BY DENYING APPELLANT'S APPLICATION FOR DNA TESTING WHEN THE RESULTS OF TESTING WOULD BE OUTCOME DETERMINATIVE.

{¶10}   In this assignment of error, Scott argues that the court erred in its recitation of certain facts.   Scott also contends that the trial court erred when it found that a DNA exclusion result would not be outcome determinative.

{¶11}   R.C. 2953.74(A) provides that a trial court "has the discretion, on a case-by-case basis, to either accept or reject" a petition for postconviction DNA testing.   Accordingly, this court's standard of review is for an abuse of discretion.   *State v. Widmer*, 12th Dist. Warren No. CA2012–02–008, 2013-Ohio-62, ¶ 111.   An abuse of discretion occurs when the trial court's attitude is unreasonable, arbitrary, or unconscionable.   *State v. Motz*, 12th Dist. Warren No. CA2019-10-109, 2020-Ohio-4356, ¶ 27.

{¶12}   Scott claims that the trial court erred when it noted in its decision that Scott's whereabouts were unknown around the time of Buckley's murder and that Scott was observed wet upon returning to the party.   In support, Scott points to selective portions of testimony from various witnesses who estimated, roughly, when they had seen Scott at the party, and specifically with regard to when they had seen him breaking up a fight between two partygoers.   Scott argues that the fight occurred in the same "timeframe" as Buckley's death.

{¶13}   The record indicates that Buckley's estimated time of death was midnight, plus or minus an indeterminate amount of time.   There was no evidence that the fight occurred simultaneously with Buckley's death.   And some witness testimony indicated that the fight occurred after midnight.

- 4 -

{¶14} There was evidence that Scott and Buckley left the party together before midnight. A partygoer indicated that Buckley's friend was looking for her before midnight, and that Scott's girlfriend was looking for him before midnight. Witnesses also testified to observing Scott wet when he returned to the party. Accordingly, the court did not err in its recitation of the facts. This argument is meritless and does not establish any abuse of discretion in the underlying decision of the common pleas court.

{¶15} Scott next argues that the court abused its discretion when it determined that a DNA exclusion would not be outcome determinative. In particular, Scott challenges the probative value of the evidence cited by the court in its decision.

{¶16} R.C. 2953.74(B)(1) provides that a court may accept an application for DNA testing where DNA testing was not performed at the trial stage and was not yet available, and where "the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at that trial stage * * *."

{¶17} "Exclusion" or "exclusion result" means "a result of DNA testing that scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question* * *." R.C. 2953.71(G). "Outcome determinative" means, in relevant part:

> [H]ad the results of DNA testing of the subject offender been presented at the trial * * * and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case * * * there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense.

R.C. 2953.71(L).

{¶18} As an initial matter, Scott repeatedly presents arguments attempting to

- 5 -

expand the statutory definition of "exclusion result." Scott's arguments imply that the common pleas court, in considering a DNA exclusion result, should have also presumed that DNA testing of Buckley's rape kit and fingernail scrapings would match the DNA of a known felon or of one of Scott's "alternative suspects" presented through his defense case. However, there is no statutory basis for a presumption that an exclusion result will identify any particular person. While the court must consider the defense theories as part of the criteria for granting a petition under R.C. 2953.74(C), the only required presumption under that section is that DNA testing of the subject evidence would biologically exclude the offender. R.C. 2953.74(C)(4) and (5).

{¶19} In challenging the evidence relied upon by the common pleas court, Scott argues that the court abused its discretion by considering the testimony of Tony Young, who testified that he observed Scott and Buckley alone, engaged in an apparent sexual act, at the approximate time that Buckley was missing from the party. Scott argues that Young's testimony is unreliable because he later recanted his testimony.

{¶20} Upon review of Young's trial testimony, this court does not find that the common pleas court abused its discretion. At trial, Young provided detailed testimony concerning his activities in New Paris on the day of the party, the manner in which he snuck into the party, his actions at the party, and his observations of people he recognized at the party, including Scott and Buckley. Young testified that he could recognize Scott on sight and had seen him 20 or 30 times before that night.

{¶21} Young described watching three couples leave the beach area and walk towards a path, one at a time. The second couple that left was Scott and Buckley. Scott had his arm around Buckley and was "pretty drunk."

{¶22} Sometime later, someone asked Young if he had an invitation to the party. He said he did not and was told to leave. Young left the party using the same walking path

previously used by the three couples.

{¶23} While walking on the path, he observed Scott and Buckley, 20 to 30 feet away, in the grass. There was no artificial light, but the moon and the stars illuminated the area.[1] He could see their faces. Scott was on top of Buckley. Buckley was lying on her stomach. Scott had his pants down. Young observed Scott moving his hips and making "sexual motions." He watched them for two to three seconds and then moved on, not wanting to be seen by Scott.

{¶24} On cross-examination, Young did not waiver in his claims. When pressed for details about his observation of Scott and Buckley, Young provided additional information about how it was possible for him to have seen Buckley's face, how Scott's and Buckley's bodies were positioned, and how they were oriented with respect to where he was standing. Young disclaimed the notion that he could have been mistaken about the identification. He stated, "ain't no doubt in my mind" that it was Scott and Buckley.

{¶25} Seventeen years later, Young recanted his trial testimony in a 2009 interview with the Ohio Innocence Project. Young again recanted in 2015, in an interview with the Preble County Sheriff's Office. However, as detailed in the state's memorandum contra to Scott's petition, there were numerous credibility issues with these recantations. The reason given by Young for his recantations was not that he was mistaken about the identifications, but rather, that he perjured himself as part of a scheme concocted by Judy Stoner.

{¶26} In April 1991, nine months after Buckley's death, Scott was involved in a fight wherein he shot and killed Judy Stoner's son, Ricky Stoner, and another individual. Scott was charged with murdering both men. In his 2009 recantation, Young claimed that just weeks after Ricky's death, in May 1991, he met Judy Stoner at her home, where she asked

---

1. Many witnesses at trial who attended the party described the night as being well-lit by natural light sources.

him to give false testimony against Scott in Buckley's murder trial, as apparent retribution for Ricky's death. However, the timing on this claim is questionable. At the time that Judy allegedly approached Young, Scott had not yet been tried for Ricky's murder, which trial was scheduled for July 1991. It appears incredible that Judy Stoner would be plotting to ensure that Scott was found guilty of Buckley's murder before he had been tried for Ricky's murder.[2]

{¶27} In his 2015 recantation, Young now claimed that he met with Judy Stoner and Buckley's mother, Mary Buckley, at a motel, to discuss their plans to frame Scott for Buckley's death. Young claimed that Mary Buckley's motive was that she "believed in her heart" that Scott killed her daughter. He also now claimed that this meeting occurred *after* Scott's acquittal for Ricky's murder. It is noteworthy that the record reflects that neither the Ohio Innocence Project nor Scott filed any petition for postconviction relief with respect to either recantation. In sum, Young's trial testimony bore indicia of reliability; his recantations decades later lack credibility.

{¶28} Scott also claims that there were inconsistencies, credibility issues, and conflicts in the testimony of witnesses that claimed that Scott made unprompted, inculpatory statements, at two parties. Thomas Riley testified about a party at his home in October 1990. He recalled that Scott's girlfriend, Jena Spangler, and another girl were fighting because Scott had apparently given the other girl a necklace. Then, without any relation to this ongoing argument, Scott interrupted and asked the room whether anyone thought that he had killed Lesa Buckley and then further asked if anyone would turn him in and have him put in jail. Riley testified that people in the room responded to the effect of "yes," if they

---

2. At his trial for double murder, Scott testified and claimed self-defense. The jury acquitted Scott of Ricky's murder and convicted him of voluntary manslaughter as to the other individual. *State v. Scott*, 12th Dist. Preble No. CA91-08-015, 1992 WL 139368 (June 22, 1992).

thought that he had done it. Angie York corroborated Riley's claim about Scott's unprompted outburst. She recalled a "scuffle" going on at the party and then heard Scott say, "how many people in this room think I'm guilty of killing Lesa Buckley, and if there is how many will testify?"

{¶29} Scott suggests that the testimony of Riley and York is less credible given a conflicting version of events presented by a different witness, Roger Fugate. Fugate testified that he was at Riley's party and could hear and see Scott in another room. He overheard Scott saying, "I killed the bitch, she deserved it. If anyone's got anything to make of it, then they'll be next."

{¶30} However, Fugate never mentioned a scuffle or argument preceding Scott's statements, and it is conceivable that Fugate heard a different statement Scott made at the party. Regardless, Fugate's testimony does not contradict the testimony of Riley and York.

{¶31} Angie York also testified about a discussion between her, Scott, and Jena Spangler, which occurred at a New Year's Eve party at her home. They were talking about Buckley and then Scott said, sarcastically, "I killed the bitch. Ha. Ha. Ha." Scott challenges this testimony by arguing that Jerry York and Missy Jurdens were also at this party but testified that they did not hear any discussion concerning Buckley. However, Angie York testified that the only people in the conversation were her, Scott, and Spangler. Thus, that Jurdens and Jerry York did not hear this specific discussion is irrelevant. Jerry York also testified that he passed out at the party.

{¶32} Scott also challenges the testimony of Jason Burkhardt, who told jurors that Scott confessed to him in the summer of 1990 outside the Triangle bar in Greenville, Ohio. Scott and Kevin Gray had asked Burkhardt to go outside the bar with them and smoke a joint in a truck. While the three men were smoking, they discussed their criminal backgrounds, while also commenting on the women entering or exiting the bar.

{¶33} Burkhardt had been charged in Indiana with attempted murder and they began talking about this case. Gray made the comment that "it's fucked up that [Burkhardt] was going to get in trouble for something he didn't do and [Scott] would be getting away with something that he did do." This made Scott laugh.

{¶34} Later in the conversation, Scott asked Burkhardt if he thought that the authorities in Ohio had enough evidence to convict him of Buckley's death. He explained that there were no eyewitnesses. Burkhardt indicated it would be difficult. Scott then commented, "if you took care of that bitch you was with the way I took care of mine you wouldn't have nobody telling on you."

{¶35} Burkhardt said that Scott then told him what happened that evening. He said that Buckley was all over him, teasing him, but then indicated that she wasn't going to "give him none." So Scott "smacked her around a bit" and "took it." Burkhardt clarified that by "it" he was referring to "pussy." Afterwards, Buckley told Scott that she was going to tell police, so Scott smacked her around some more and "took care of it."

{¶36} Burkhardt asked Scott why he would want to be the first one to find Buckley's body. Scott relayed that he was concerned that he may have left something at the scene, possibly a belt, and also that he wanted to be able to explain the presence of any evidence discovered on Buckley's body should such evidence be tied to him. If Scott found Buckley first, then this could explain such evidence. Burkhardt also confirmed that he had not been offered any deal for his testimony.

{¶37} Scott argues that Burkhardt's confession is not persuasive evidence because a witness at trial testified that Gray refused an invitation by the police to testify against Scott and corroborate Burkhardt's testimony. Apparently, Gray refused to testify despite an offer to drop charges against him in exchange for his testimony. However, Burkhardt testified that he only knew Scott through Gray. Thus, Gray may have been Scott's friend, which

would explain his reluctance to testify.

{¶38} On its face, Burkhardt's testimony seems credible. He was cross-examined but did not waiver on any details of Scott's confession. If the jurors believed Burkhardt, his testimony was not diminished because Gray refused to testify.

{¶39} Scott next argues that the evidence concerning his ability to immediately identify Buckley's body upon discovery was not persuasive evidence of his guilt. Scott contends that Buckley was wearing the same clothing from the night prior and Scott would have seen that clothing. Scott also discounts the import of Jerry York's inability to recognize Buckley upon her discovery. Scott points out that York had not been at the party and thus would not have known what clothing Buckley was wearing.

{¶40} Scott fails to cite any evidence in the record that supports the argument that Scott's identification of Buckley was based on observing her clothing. The evidence indicates that Scott turned Buckley over in the water and identified her. York testified that Buckley's hair had been ripped out and her face was bloated and black and blue and that he would not have been able to identify her in that condition. The evidence concerning Scott's identification of Buckley upon finding her is relevant and probative circumstantial evidence of Scott's involvement in Buckley's death.

{¶41} Scott also contends that York's testimony about the discarding of potential evidence, i.e., a red lighter and a large plastic cup, immediately after finding Buckley's body, was not probative of his guilt. He claims that York never told police about the red lighter, that there was no evidence that the red lighter belonged to Buckley, or that the cup belonged to Scott.

{¶42} York testified that he threw the lighter into the water at Scott's suggestion, because of a concern for leaving fingerprints on the lighter. And there was evidence that Scott possessed the cup. The cup was a distinctive large plastic cup from Kentucky Fried

Chicken. At trial, York identified a photograph of Scott holding what appeared to be the same cup. This odd behavior of apparent evidence destruction, immediately following the discovery of Buckley's body, is circumstantial and probative evidence of Scott's involvement in Buckley's death.

{¶43} Finally, Scott argues that the court failed to consider his defense theories at trial, which was that Buckley was killed by one or more members of the Johnson family. Ronnie Johnson was Buckley's abusive ex-boyfriend. Buckley and Lisa Johnson were formerly friends, but their relationship had soured. Scott claims police never investigated the Johnsons' whereabouts the night of Buckley's death.

{¶44} Ronnie and Lisa Johnson both testified as defense witnesses. Ronnie testified that he dated Buckley for approximately four months and that they had stopped dating in February or March of 1990. He admitted that their relationship was physically abusive. On the day of Buckley's death, Ronnie was driving around with his cousin, Lisa Johnson. On the night of July 7, 1990, he was at home. No one from the sheriff's office had talked to him about Buckley's death. However, a private detective spoke with him. He denied any involvement in Buckley's death.

{¶45} Lisa Johnson testified that she had been good friends with Buckley but was not friends with her at the time of Buckley's death. They had an argument over some issues involving prom. During this argument, Lisa accidentally ran over Buckley's foot while leaving the scene in a vehicle. Lisa was at Ronnie's home on the night Buckley was murdered. Lisa denied any involvement in Buckley's death.

{¶46} No witnesses at trial testified to seeing a Johnson family member at the party. The record indicates that the Johnson family was specifically not welcome at the party. In this respect, another member of the Johnson family, Tommy Johnson, had attempted to enter the party, but was turned away. One witness claimed to have seen Ronnie Johnson's

car at the party but did not see who was driving it. In sum, there was no credible evidence of any involvement by the Johnsons in Buckley's death.

{¶47} The evidence underpinning Scott's conviction was based on eyewitness testimony and circumstantial evidence. However, circumstantial evidence and direct evidence have same probative value. *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 17 (12th Dist.). Other courts have examined cases lacking physical evidence and found that a DNA exclusion result would not be outcome determinative where there was a sufficient "margin of evidence" by which the defendant was convicted.

{¶48} In *State v. Hatton*, 4th Dist. Pickaway No. 05CA38, 2006-Ohio-5121, Hatton and a codefendant entered a home and raped a teenager. Hatton fled upon hearing the teenager's father coming to investigate. *Id.* at ¶ 4. But the father caught the codefendant before he could escape. The codefendant then identified Hatton as the person who had fled. *Id.* In the ensuing police investigation, Hatton denied any involvement but attempted to mislead the police as to the clothing he was wearing that evening. *Id.* at ¶ 24. A DNA sample was taken from several pieces of evidence, but it produced no results and could not include or exclude Hatton as a contributor. *Id.* at ¶ 16. The jury found Hatton guilty. *Id.* at ¶ 18.

{¶49} In affirming the denial of the Hatton's motion for postconviction DNA testing, the court held that a DNA exclusion result would not be outcome determinative because the state had not relied on DNA evidence to prove its case. *Id.* at ¶ 34. Instead, the rape conviction was primarily based upon Hatton's identification by the codefendant, by Hatton's statement to a third individual that he was in the "wrong place at the wrong time," and Hatton's decision to mislead investigating police officers. *Id.* Thus, the court resolved that reasonable jurors could have found Hatton guilty even in the face of a DNA exclusion.

{¶50} In so holding, the Fourth District cited a distinguishable case from the Eighth

District. *Id.* at ¶ 33, citing *State v. Wilkins*, 163 Ohio App.3d 576, 2005-Ohio-5193 (9th Dist.), in turn discussing *State v. Hightower*, 8th Dist. Cuyahoga Nos. 84248 and 84398, 2005-Ohio-3857. In *Hightower*, the defendant was charged with rape and the state's case was primarily based upon the presence of semen in the victim's vagina and the testimony of another witness, who was not the victim, to corroborate that a rape had occurred. *Wilkins* at ¶ 15. In concluding that a DNA exclusion result would be outcome determinative, the 8th District Court noted that the "margin of evidence" by which Hightower was convicted was "extremely narrow" and that a prior jury had been unable to return a verdict on rape. *Hightower* at ¶ 29.

{¶51} This case is similar to *Hatton* in that Scott's conviction was not premised on the physical evidence recovered from Buckley's autopsy that Scott now seeks to test. Instead, his conviction was based on eyewitness testimony placing him away from the party at the time of Buckley's murder, alone with Buckley at the time of her murder, multiple inculpatory statements, and substantial circumstantial evidence in both quantity and quality.

{¶52} This is not a case where the margin of evidence was so narrow that a DNA exclusion result would lead to a strong probability that no reasonable factfinder would have found Scott guilty. This is also not a case where Scott's conviction was premised on one or a few pieces of suspect evidence, or a single eyewitness's questionable identification. The jurors considered the testimony of dozens of witnesses and numerous pieces of circumstantial evidence that, when fit together, led them to the conclusion, beyond a reasonable doubt, that Scott assaulted, raped, and murdered Buckley. Given the breadth of evidence, this court does not conclude that the common pleas court acted unreasonably, arbitrarily, or unconscionably in finding that a DNA exclusion result would not be outcome determinative. This court overrules Scott's first assignment of error.

{¶53} Assignment of Error No. 2:

{¶54} THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE THE REQUIRED STATUTORY FINDINGS PURSUANT TO R.C. 2953.74 IN DENYING APPELLANT'S APPLICATION FOR DNA TESTING.

{¶55} Scott argues that the trial court failed to make "required statutory findings" under R.C. 2953.74. In relevant part, R.C. 2953.73(D) provides:

> Upon making its determination, the court shall enter a judgment and order that either accepts or rejects the application and that includes within the judgment and order the reasons for the acceptance or rejection as applied to the criteria and procedures set forth in sections 2953.71 to 2953.81 of the Revised Code.

{¶56} Thus, unlike the general postconviction relief statutes, a court dismissing a petition for postconviction DNA testing is not required to issue specific findings of fact and conclusions of law.[3] The decision need only set for "the reasons" as applied to the statutory criteria, which are, for the most part, set forth in R.C. 2953.74(B) and (C).

{¶57} Scott principally argues that that the trial court failed to indicate that it considered his defense theories at trial or the relevant evidence obtained after trial, i.e., Young's recantations. However, the parties stipulated that the only issue the court needed to decide was whether an exclusion result would be outcome determinative. The court's decision was seven pages and thoroughly explained the reasons for rejecting Scott's petition. The decision did not discuss Scott's theories with regard to the Johnson family or the Young recantations. However, Scott's memorandum in support of his petition for DNA testing discussed these theories and Young's recantations at length. The state's memorandum in opposition responded, detailing the lack of evidence concerning the Johnsons' involvement in Buckley's death and the lack of reliability of Young's recantations.

{¶58} The court's decision indicates that the it reviewed "all written arguments, the

---

3. R.C. 2953.21(D).

supporting affidavit, the documentary evidence, and documents in the case." Thus, the court considered the defense theories and postconviction evidence in rendering its decision. Moreover, for the reasons stated in response to Scott's first assignment of error, neither Scott's defense theories nor the Young recantations established any abuse of discretion in the court's decision. This court overrules Scott's second assignment of error.

{¶59} Judgment affirmed.

M. POWELL, P.J., and RINGLAND, J., concur.