[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hatton*, Slip Opinion No. 2022-Ohio-3991.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3991

THE STATE OF OHIO, APPELLEE *v.* HATTON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hatton*, Slip Opinion No. 2022-Ohio-3991.]

*Crim.R. 33(B)—R.C. 2953.21 and 2953.23—The trial court and court of appeals abused their discretion by applying res judicata to bar defendant's claims— Judgment reversed and cause remanded to the trial court.*

(No. 2021-0704—Submitted March 30, 2022—Decided November 10, 2022.)

APPEAL from the Court of Appeals for Pickaway County, No. 19CA34, 2021-Ohio-1416.

_____

**O'CONNOR, C.J.**

**{¶ 1}** Appellant, Martin L. Hatton, is serving an aggregate 39-year prison sentence for his 1997 convictions for aggravated burglary, kidnapping, rape, felonious assault, and theft—offenses that he has consistently maintained he did not commit. Hatton has unsuccessfully challenged his convictions on direct appeal,

in a timely petition for postconviction relief, and in numerous other postconviction filings.

{¶ 2} In 2018, more than 20 years after his convictions, Hatton discovered through a public-records request a memorandum from Raman Tejwani, the DNA expert who testified for the state at Hatton's trial, to the Pickaway County prosecutor dated June 22, 1998. In the memo, Tejwani acknowledged that the mixed samples (i.e., DNA samples that included DNA from more than one contributor) about which she had testified at Hatton's trial contained male DNA from someone other than Hatton or Ricky Dunn, whom the state had identified as the second of two participants in the offenses and against whom the state had also obtained convictions.

{¶ 3} Based primarily on his discovery of the Tejwani memo, Hatton filed a motion for leave to file a motion for a new trial and a successive petition for postconviction relief, both of which the Pickaway County Court of Common Pleas denied without a hearing. The Fourth District Court of Appeals affirmed the trial court's judgment.

{¶ 4} We reverse the court of appeals' judgment and remand this matter to the trial court for further proceedings.

**Relevant Background**

*Trial proceedings*

{¶ 5} Following a jury trial in 1997, Hatton was convicted of aggravated burglary, kidnapping, rape, felonious assault, and theft. The state's theory of the case was that Hatton and Dunn entered the Circleville home of P.C. and S.C., that Hatton raped their 17-year-old daughter J.C. at knifepoint in her upstairs bedroom, and that Hatton then forced her downstairs to the family room, where Dunn raped her. J.C.'s trial testimony tracked the state's theory, although she could not identify Hatton as the man who had raped her in her bedroom.

{¶ 6} During the crimes, J.C.'s father, P.C., walked downstairs to investigate sounds he had heard from his bedroom. From the stairway, P.C. observed one person, whom he could not identify, running from the house. However, P.C. was able to restrain a second person—later identified as Dunn—who ran into him after he reached the bottom of the staircase. P.C. testified that while he and Dunn struggled, Dunn screamed out the door, "Marty, Marty, Marty!" and stated, "I came with Marty Hatton." Meanwhile, J.C. ran upstairs to her mother, and they called 9-1-1.

{¶ 7} Sergeant Wayne Gray, the first police officer to arrive at the scene, found P.C. standing over Dunn in the foyer. Dunn was screaming for "Marty," and he told Sergeant Gray he was there with "Marty Hatton." The officers arrested Dunn and began searching for the second suspect.

{¶ 8} A more complete description of the testimony from Hatton's trial, including Dunn's incriminating testimony and evidence that Dunn and Hatton were together on the night of the offenses, may be found in *State v. Hatton*, 4th Dist. Pickaway No. 97 CA 34, 1999 WL 253450 (Apr. 19, 1999) ("*Hatton I*"). Here, though, we focus on the DNA evidence presented at Hatton's trial.

{¶ 9} The state called Tejwani, a criminalist employed by the city of Columbus's crime lab, as an expert witness. The crime lab had received from the Circleville Police Department blood samples from Hatton, Dunn, and J.C.; vaginal swabs and underwear collected from J.C.; and a purported semen stain on a piece of fabric cut by the police from a sweatshirt that Hatton was allegedly wearing on the night of the offenses. The stain from the sweatshirt did not contain enough cells to extract DNA, and no conclusions could be drawn regarding its source. The lab performed a differential extraction of the mixed samples on the vaginal swabs and underwear to separate the female and male fractions, and it used a polymerase chain reaction to test the DNA.

**{¶ 10}** Tejwani testified that the male fractions from the vaginal swabs and underwear "could not give information for the contributor[s]" because they were mixed samples and that she could "neither exclude nor include anybody" as a contributor to those mixed samples. With respect to those mixed samples, the table of test results included in the lab report signed by Tejwani, provided to Hatton's counsel before trial, and admitted as evidence stated only, "Inconclusive."

**{¶ 11}** During her trial testimony, Tejwani referred to her notes, which the state had not produced to Hatton but which Tejwani agreed to provide to Hatton's attorney at the conclusion of her testimony.

**{¶ 12}** The next day, Hatton called his own forensic expert, Larry M. Dehus, who had reviewed the lab report and the notes that Tejwani had provided to defense counsel the previous day. He testified that "there was information in the notes that was not included in the report," specifically the presence of a faint B allele in the mixed-sample male DNA fractions at genetic marker D7S8. According to Dehus, the B allele was significant because it could not have come from Hatton, Dunn, or J.C., all of whom had only A alleles at that genetic marker. He therefore opined that someone other than Hatton and Dunn "was [a] contributor to semen in those samples."

**{¶ 13}** The state neither offered a rebuttal to Dehus's testimony that the mixed samples contained DNA from a male contributor other than Hatton or Dunn nor suggested an alternative source for the additional DNA. In fact, the prosecutor ignored Dehus's testimony about the significance of the B allele altogether, never once mentioning the B allele in his cross-examination of Dehus. Instead, the prosecutor focused almost exclusively on impeaching Dehus's qualifications. In his closing argument, the prosecutor told the jury that Dehus's testimony was no different from Tejwani's testimony—that the DNA test results did not conclusively include or exclude Hatton. But the prosecutor then flatly rejected the defense's argument that someone other than Hatton and Dunn was involved: "There was no

third person. It was Ricky Dunn and Marty Hatton inside that residence * * * beyond any reasonable doubt."

### *Hatton's direct appeal and initial petition for postconviction relief*

{¶ 14} The Fourth District affirmed Hatton's convictions on direct appeal. *Hatton I*, 4th Dist. Pickaway No. 97 CA 34, 1999 WL 253450. As relevant here, the court of appeals rejected Hatton's argument that the state's failure to disclose the existence of the B allele prior to trial deprived him of a fair trial. *Id.* at *20-21. It stated that unlike a typical violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in which the jury is denied the opportunity to hear about the alleged exculpatory evidence, Hatton's expert witness was able to testify at trial about the B allele and its significance. *Hatton I* at *21.

{¶ 15} In 1998, while his direct appeal was pending in the court of appeals, Hatton filed a petition for postconviction relief in the trial court. There, he again argued that the state had "failed to disclose relevant, exculpatory evidence"—the presence of the B allele—"in time for its effective use at trial." In support of his petition, Hatton filed an affidavit from molecular biologist Christie T. Davis. Davis agreed with Tejwani's characterization of the male DNA fractions from the mixed samples as "inconclusive," but she also stated that the B allele must have come from someone other than Hatton or Dunn. After the court of appeals affirmed Hatton's convictions in his direct appeal, the trial court denied Hatton's petition for postconviction relief without holding a hearing, characterizing the arguments in his petition as "basically identical" to those he had unsuccessfully raised on appeal. The Fourth District affirmed that judgment, stating that Davis's affidavit was "not altogether different from" Dehus's testimony and did not demonstrate that Tejwani had testified falsely. *State v. Hatton*, 4th Dist. Pickaway No. 00CA10, 2000 WL 1152236, *5 (Aug. 4, 2000).

### *The Tejwani memo*

{¶ 16} In 2018, in response to a public-records request, Hatton received for the first time a copy of a memo from Tejwani to the county prosecutor. The memo was dated June 22, 1998, a date on which both Hatton's direct appeal and his first petition for postconviction relief were pending. The memo, which Tejwani wrote following a phone conversation she had with Hatton's postconviction counsel, Keith Yeazel, states:

> Mr. Yeazel was concerned about the origin of the faint "B" type observed at the D7S8 locus in sample 5 (vaginal swabs, male fraction) as reported in the Crime Lab log, page 3. This type was not observed in the known blood samples of [J.C.], Martin L. Hatton or Ricky D. Dunn. The male fraction of the vaginal swabs consisted of a mixed DNA sample and no information regarding the contributor could be obtained from the DNA typing results which were reported as "inconclusive" in the Lab Report.

{¶ 17} In the memo, Tejwani implicitly informed the prosecutor that Hatton's attorney was asking about an element of the DNA test results that she had not included in the lab report or testified about at trial, and she also acknowledged that neither Hatton nor Dunn could have contributed the B allele that was found in the mixed samples, because a B allele was "not observed in the known blood samples." The memo was the first and only acknowledgment in the record by a *state's* witness that the B allele indicated that someone other than Hatton or Dunn had contributed to the male DNA in the mixed samples. The prosecutor did not disclose the Tejwani memo to Hatton's trial, appellate, or postconviction counsel. And Hatton did not learn of its existence for more than 20 years.

### *Hatton's 2019 motion for leave to file a motion for a new trial and his petition for postconviction relief*

{¶ 18} In 2019, based primarily on his discovery of the Tejwani memo,[1] Hatton filed a motion for leave to file a motion for a new trial and a petition for postconviction relief. Hatton made similar arguments in both filings and requested an evidentiary hearing and a new trial. Hatton argued that the memo contradicted Tejwani's trial testimony that the DNA test results were inconclusive and that the memo demonstrated that the test results excluded him as a contributor to the mixed samples. He also argued that the state's failure to disclose that material, exculpatory information and its presentation of false testimony from Tejwani violated his right to a fair trial. Finally, he preemptively argued that res judicata should not apply, because the Tejwani memo had not been "subject to inclusion or review at any level."

{¶ 19} The trial court addressed Hatton's motion and postconviction petition together, and it denied both without a hearing. Without distinguishing between the motion and the petition, the court summarily rejected Hatton's arguments that the memo contradicted Tejwani's trial testimony and that it demonstrated that the test results excluded him as a source of the DNA. It also held that res judicata barred Hatton's arguments because the memo was "not really new" evidence and because the "issue [had] been litigated and decided before." On appeal, the Fourth District agreed that res judicata barred Hatton's requested relief, and it affirmed the trial court's judgment. 2021-Ohio-1416, ¶ 29, 39, 46.

---

1. In support of his motion and petition, Hatton also submitted evidence that in 2009, Dunn recanted his testimony that implicated Hatton in the offenses, but both the trial court and the court of appeals had previously considered the recantation and found it not credible. *See State v. Hatton*, 4th Dist. Pickaway No. 13CA26, 2014-Ohio-3601. Hatton also submitted a purportedly newly discovered police report in which a detective noted that he and another officer did not believe Dunn's initial statements to them that Dunn had had consensual sex with J.C.

**{¶ 20}** In this discretionary appeal, Hatton presents three propositions of law. He asks this court to hold that (1) the state must always disclose DNA test results that exclude a defendant as a contributor to an evidentiary DNA sample, (2) the state must disclose DNA test results and analyses if it learns, even after trial, that its expert testified contrary to those results, and (3) a trial court errs by denying a petition for postconviction relief when the petitioner has established with newly discovered evidence that the conviction was based on materially false evidence.

### Analysis

**{¶ 21}** We do not reach Hatton's propositions of law, which concern the merits of whether Hatton is entitled to a new trial under Crim.R. 33 or R.C. 2953.21 and 2953.23, because determinative threshold issues require us to reverse the court of appeals' judgment and remand this matter to the trial court for further proceedings.

### *Res judicata does not bar Hatton's motion or his petition*

**{¶ 22}** Before directly addressing Hatton's motion for leave to file a motion for a new trial and his petition for postconviction relief, we first reject the trial court's and court of appeals' determinations that res judicata precludes Hatton from seeking a new trial and postconviction relief based on the recently discovered Tejwani memo. The doctrine of res judicata precludes a convicted defendant "from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised" at trial or on direct appeal. *State v. Szefcyk*, 77 Ohio St.3d 93, 671 N.E.2d 233 (1996), syllabus. Res judicata applies to motions for a new trial, *see, e.g.*, *State v. Rodriguez*, 8th Dist. Cuyahoga No. 108048, 2019-Ohio-5117, ¶ 23, and petitions for postconviction relief, *see State v. Reynolds*, 79 Ohio St.3d 158, 679 N.E.2d 1131 (1997).

**{¶ 23}** The trial court here held that res judicata bars Hatton's claims because his purportedly " 'new evidence' is not really new" and because his

arguments have been litigated before. The court of appeals likewise concluded that res judicata bars Hatton's claims. It reasoned, "[T]he pertinent information from the [Tejwani] memo was known and available to [Hatton] during his trial." 2021-Ohio-1416 at ¶ 28. It also stated that Hatton had challenged, albeit unsuccessfully, Tejwani's credibility in his 1998 petition for postconviction relief. *Id.* at ¶ 29. Both courts' conclusions, however, are based on a fundamental misunderstanding of the Tejwani memo and its import.

**{¶ 24}** While the existence of the B allele and its omission from the lab report and Tejwani's trial testimony did permeate Hatton's arguments on direct appeal and in his 1998 petition for postconviction relief, the Tejwani memo does more than simply restate the existence of the B allele and reiterate Tejwani's testimony that the DNA test results were inconclusive. The new information in the memo is the acknowledgment by Tejwani—the *state's* expert witness—that the B allele could not have originated from Hatton or Dunn and that, therefore, DNA from *another male* was present in the mixed samples. That new information creates an obvious hole in the state's narrative that *two* men entered J.C.'s home, that those *two* men raped J.C. and left their DNA, and that those *two* men were Hatton and Dunn. If the male DNA in the mixed samples was wholly contributed by two men, one of whom was Dunn, then Tejwani's acknowledgment of the B allele and its significance would mean that Hatton could not have been the other contributor.[2]

**{¶ 25}** Tejwani's acknowledgment in the memo of the significance of the B allele, which was glaringly absent from both the lab report and her trial testimony,

---

2. This does not mean that the test results necessarily exonerate Hatton, because we do not know whether the mixed samples contained DNA from two men or from more than two men. Davis stated that the male fraction indicated "a mixture of DNA from at least two individuals," and Tejwani could say only that there was "more than one donor." Dehus stated that someone other than Hatton and Dunn must have contributed to the male fraction of the samples. Davis also acknowledged scenarios under which DNA from a male, unconnected to the offenses, could have ended up in the mixed samples. That said, no evidence was introduced at trial to identify any innocent source of DNA in the male fraction of the samples.

is qualitatively different than bare knowledge of the B allele's presence. Had he been armed with the withheld acknowledgement by the state's own expert, Hatton could have impeached Tejwani's incomplete testimony and buttressed, if not outrightly confirmed, defense expert Dehus's testimony about the DNA test results, the substance of which the prosecutor essentially ignored. Additionally, had Tejwani's acknowledgement come out at trial, it likely would have compelled the state to offer some explanation for the additional or alternative contributor to the mixed samples, given the state's theory that Dunn and Hatton were *the only two* offenders. Tejwani's acknowledgment and its potential effect on Hatton's trial have not been, and could not have been, litigated before. Accordingly, we conclude that both the trial court and the court of appeals abused their discretion by applying res judicata to preclude Hatton from arguing for a new trial and postconviction relief based on newly discovered evidence.

### *Motion for leave to file a motion for a new trial*

{¶ 26} We now turn to Hatton's motion for leave to file a motion for a new trial.

{¶ 27} Crim.R. 33(A) states: "A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights: * * * (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." Generally, a motion for a new trial based on newly discovered evidence must be filed within 120 days after the jury verdict was rendered or the trial court's decision was issued if the defendant waived the right to a jury trial. Crim.R. 33(B).

{¶ 28} An untimely motion for a new trial based on newly discovered evidence may be filed only if the defendant first establishes by clear and convincing evidence that he was unavoidably prevented from discovering the evidence within the 120-day period. *Id.* If the trial court determines that the defendant has met that

10

burden and grants a motion for leave to file a motion for a new trial, then the defendant must file that motion within seven days. *Id*. In the motion for a new trial, the defendant must show that the newly discovered evidence discloses " ' "a strong probability that it will change the result if a new trial is granted" ' " and that it is not " ' "merely cumulative to former evidence." ' " *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 85, quoting *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993), quoting *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus. The defendant is entitled to an evidentiary hearing when the allegations in the motion demonstrate substantive grounds for relief. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

**{¶ 29}** Because Hatton seeks a new trial more than 20 years after his convictions, he must comply with Crim.R. 33(B)'s two-step process for filing an untimely motion. Appellate review of a trial court's ruling on a motion for leave to file a motion for a new trial is conducted under an abuse-of-discretion standard. *State v. Townsend*, 10th Dist. Franklin No. 08AP-371, 2008-Ohio-6518, ¶ 8, citing *State v. Pinkerman*, 88 Ohio App.3d 158, 160, 623 N.E.2d 643 (4th Dist.1993), citing *State v. Wright*, 2d Dist. Greene No. 90 CA 135, 1992 WL 66385 (Mar. 31, 1992). An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 30}** When a defendant seeks leave to file a motion for a new trial under Crim.R. 33(B), the trial court may not consider the merits of the proposed motion for a new trial until after it grants the motion for leave. *State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, ¶ 41, citing *State v. Brown*, 8th Dist. Cuyahoga No. 95253, 2011-Ohio-1080, ¶ 14. The sole question before the trial court when considering whether to grant leave is whether the defendant has established by clear and convincing proof that he was unavoidably prevented from discovering the evidence on which he seeks to base the motion for a new trial.

**{¶ 31}** In support of his motion for leave to file a motion for a new trial, Hatton submitted numerous documents, including the Tejwani memo and an affidavit in which he detailed his initial receipt of the memo in 2018. Hatton could not have discovered the Tejwani memo within 120 days after the jury's verdict, because Tejwani did not write it until after that time had elapsed. And then, after Tejwani drafted the memo and transmitted it to the prosecutor, the state withheld the memo from Hatton, despite its relevance to arguments in Hatton's then-pending direct appeal and petition for postconviction relief. We have held that "a defendant may satisfy the 'unavoidably prevented' requirement contained in Crim.R. 33(B) by establishing that the prosecution suppressed the evidence on which the defendant would rely in seeking a new trial." *State v. McNeal*, __ Ohio St.3d __, 2022-Ohio-2703, __ N.E.3d __, ¶ 17, citing *Bethel* at ¶ 25, 59. The state does not dispute Hatton's assertion that he was unavoidably prevented from discovering the Tejwani memo. Instead, it continues to assert that it had no duty to turn over the memo.

**{¶ 32}** The trial court ignored Crim.R. 33(B)'s two-step process and sidestepped the preliminary question whether Hatton had demonstrated that he was unavoidably prevented from discovering the evidence on which he seeks to rely. Instead, the court improperly jumped to the merits of Hatton's claim for a new trial, which the court reviewed under the standard stated in *Petro*, 148 Ohio St. 505, 76 N.E.2d 370, at syllabus:

> To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former

12

evidence, and (6) does not merely impeach or contradict the former evidence.

The court held that the Tejwani memo was not outcome determinative, because "DNA evidence was not essential" to the state's case and the jury was able to convict Hatton based on other evidence. The court stated that Hatton's " 'new evidence' comes nowhere near meeting the conditions outlined * * * in *Petro*."

{¶ 33} Although the *Petro* standard will apply in resolving the merits of Hatton's motion for a new trial under Crim.R. 33(A)(6), Hatton was not required to satisfy that standard to obtain leave to file a motion for a new trial. He was required to establish only that he was unavoidably prevented from discovering the evidence on which he seeks to base his motion. Unless and until a trial court grants a defendant leave to file a motion for a new trial, the merits of the new-trial claim are not before the court. *See Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 41 ("The trial court should not have purported to deny Bethel's new-trial motion on its merits, because the court never permitted Bethel to file that motion"). As the Fourth District noted in this case, the state conceded that the trial court erred by failing to address the narrow, preliminary question before it. 2021-Ohio-1416 at ¶ 10-11.

{¶ 34} Hatton supported his motion for leave to file a motion for a new trial with uncontradicted evidence that, on its face, demonstrates that he was unavoidably prevented from discovering the Tejwani memo—the primary evidence upon which he seeks to base his motion for a new trial—within the time for filing a motion for a new trial. By overlooking Hatton's satisfaction of that burden and denying his motion for leave to file a motion for new trial, the trial court abused its discretion.

{¶ 35} Questions about whether Hatton's newly discovered evidence satisfies the remaining elements of the *Petro* standard, including whether the

Tejwani memo creates a strong probability that it would change the result if a new trial were granted, remain for the trial court to decide when adjudicating the motion for a new trial itself. Thus, we express no opinion on whether Hatton should ultimately prevail on the merits of his motion for a new trial.

{¶ 36} Nevertheless, we do hold that Hatton is entitled to an evidentiary hearing on his motion. The trial court ultimately and improperly decided Hatton's motion for a new trial on the merits, concluding that the Tejwani memo was not outcome determinative, and it also employed the wrong analysis to reach that conclusion. Whether suppressed evidence is outcome determinative for purposes of a motion for a new trial is not determined by whether sufficient other evidence supported the jury's verdict but by whether the suppressed evidence, when viewed in the context of the whole case, is sufficient to undermine confidence in the verdict. *McNeal*, __ Ohio St.3d __, 2022-Ohio-2703, __ N.E.3d __, at ¶ 21. As we stated above, the Tejwani memo illuminated a substantial hole in the state's theory of its case against Hatton, and Hatton reasonably alleged, and is entitled to an opportunity to prove at an evidentiary hearing, that the new information contained in the memo, had it been available to him at trial, would likely have resulted in a different outcome. We conclude that Hatton's motion alleged sufficient substantive grounds for relief to warrant a hearing.

### *Petition for postconviction relief*

{¶ 37} Finally, we turn to Hatton's petition for postconviction relief under R.C. 2953.21 and 2953.23. Pursuant to R.C. 2953.21(A)(1)(a), a convicted defendant who asserts a denial or infringement of constitutional rights sufficient to render his conviction void or voidable may file a petition asking the court that imposed sentence to vacate the judgment or sentence or to grant other relief. A petitioner, like Hatton, who files a petition more than 365 days after the trial transcript was filed in the court of appeals in his direct appeal or who files a successive petition, must satisfy the jurisdictional requirements in R.C.

2953.23(A)(1) or (2) for an untimely, second, or successive petition for postconviction relief. *Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, at ¶ 20; R.C. 2953.21(A) and 2953.23(A). To warrant an evidentiary hearing on a petition for postconviction relief, the petitioner bears the burden of producing evidence that demonstrates a cognizable claim of constitutional error. *State v. Sidibeh*, 10th Dist. Franklin No. 12AP-498, 2013-Ohio-2309, ¶ 13.

**{¶ 38}** We review a decision to grant or deny a petition for postconviction relief, including the decision whether to afford the petitioner a hearing, under an abuse-of-discretion standard. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 51-52, 58. But whether a trial court has subject-matter jurisdiction to entertain an untimely, second, or successive petition for postconviction relief is a question of law, which we review de novo. *State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 24.

**{¶ 39}** Hatton invoked R.C. 2953.23(A)(1) as the basis for the trial court's jurisdiction to consider his petition.[3] To satisfy R.C. 2953.23(A)(1), Hatton was required to show (1) that he was unavoidably prevented from discovering the facts on which he must rely to present his claim for relief and (2) that but for constitutional error at trial, no reasonable fact-finder would have found him guilty. The "unavoidably prevented" requirement in R.C. 2953.23(A)(1) mirrors the "unavoidably prevented" requirement in Crim.R. 33(B). *Bethel* at ¶ 59, citing *State v. Barnes*, 5th Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585, ¶ 28.

**{¶ 40}** Neither the trial court nor the court of appeals directly addressed whether Hatton satisfied one of the exceptions in R.C. 2953.23(A) to establish the trial court's jurisdiction to consider an untimely and successive petition for

---

3. The trial court erroneously stated that Hatton relied on R.C. 2953.23(A)(2), which is inapplicable here. *See Apanovitch* at ¶ 29 (holding that R.C. 2953.23(A)(2) confers jurisdiction only over a select class of offenders who applied for DNA testing under R.C. 2953.71 through 2953.81 or under former R.C. 2953.82).

postconviction relief. Although the trial court stated that Hatton's " 'new evidence' is not really new," it did so in the context of applying res judicata, not in the context of assessing its jurisdiction under R.C. 2953.23. Similarly, the court of appeals alluded to its finding that the Tejwani memo did not contain facts previously unavailable to Hatton, but then, rather than holding that the trial court lacked jurisdiction, the court of appeals stated, "Therefore, appellant's petition herein is also barred by res judicata." 2021-Ohio-1416 at ¶ 38.

{¶ 41} Having determined that the trial court and the court of appeals abused their discretion by applying res judicata to preclude Hatton's claims, we must reverse the court of appeals' decision affirming the dismissal of Hatton's petition for postconviction relief on that basis. On remand, the trial court must begin by answering the threshold question—whether Hatton satisfied the jurisdictional requirements of R.C. 2953.23(A)(1) to file an untimely and successive petition for postconviction relief. In answering that question, the court should avoid indulging in the mischaracterizations of the Tejwani memo that permeated the lower courts' prior decisions in this matter and that we have rejected in our discussion of res judicata above.

### Conclusion

{¶ 42} For these reasons, we reverse the judgment of the Fourth District Court of Appeals and remand this matter to the trial court with instructions that it grant Hatton's motion for leave to file a motion for a new trial; afford Hatton an evidentiary hearing on his motion for a new trial; and determine whether Hatton has satisfied the jurisdictional requirements for an untimely and successive petition for postconviction relief under R.C. 2953.23(A)(1), and if so, determine the merits of that petition.

Judgment reversed
and cause remanded.

FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs, with an opinion joined by BRUNNER, J.

KENNEDY, J., concurs in judgment only.

_____

**DONNELLY, J., concurring.**

{¶ 43} I fully join the majority opinion. I write separately to note that a sizeable amount of evidence outside the trial-court record has accumulated in this case from the many postconviction filings made between 1998 and 2019 by appellant, Martin Hatton. When postconviction petitioners seeking new trials provide evidence outside the trial-court record that potentially undermines the theory of guilt that was used to convict them, courts should hold hearings on the petitions as a regular practice. But Ohio courts are not doing this. I also write to emphasize the pitfalls of having only one trial judge assess the integrity of a conviction throughout the entire life of a criminal case. And there are pitfalls to conducting postconviction review as a continuation of the adversarial process rather than as a neutral truth-seeking process. Justice would be better served by expanding the rules that apply to petitions for postconviction relief and motions for a new trial that involve claims of actual innocence and relevant evidence that was not proffered at the time of trial. Justice would also be better served by supplementing the postconviction process with an independent commission that has the power to investigate claims of actual innocence and assess whether a viable claim of innocence has been established. This case highlights the need for such reforms.

{¶ 44} As is clear from the majority opinion, the identity of the second perpetrator was the central issue at Hatton's 1997 trial. The rape victim was unable to identify the person who, along with Ricky Dunn, broke into her home and raped her. As the state's DNA expert testified, the DNA evidence was inconclusive. The state's expert also knew that the DNA samples contained male DNA that could not have come from Hatton or Dunn, but the state failed to disclose that fact to the defense before or during the expert's testimony. The state did not provide Hatton

with the expert's revelatory DNA-analysis notes until after the expert had testified. However, Dunn testified that Hatton was the second perpetrator, and other witnesses testified that Dunn had identified Hatton as the second perpetrator.

{¶ 45} In support of his 1998 postconviction petition, Hatton submitted the affidavit of a DNA expert averring that the state had used scientifically unacceptable procedures in performing its DNA testing and that her review of the state's results indicated that either Hatton was not a contributor to the DNA samples or that a third male had also contributed to the DNA samples. Hatton also provided an affidavit from Dunn's cellmate averring that Dunn had told him that he had falsely identified Hatton as the second perpetrator. The trial court denied the petition without a hearing, concluding that the DNA expert's affidavit submitted by Hatton did not contain new evidence outside the trial-court record (other than the expert's opinion of the evidence that had been presented at trial) and that the cellmate's affidavit was hearsay and did not "create a strong probability the result in [a new] trial would be different."

{¶ 46} In 2005 and 2008, with the help of the Ohio Innocence Project, Hatton requested postconviction DNA testing. The trial court concluded in both instances that DNA testing was unwarranted because a "reasonable jury" could still find Hatton guilty "based solely upon circumstantial evidence and testimony of the other witnesses." The court of appeals affirmed both judgments. *State v. Hatton*, 4th Dist. No. 05CA38, 2006-Ohio-5121; *State v. Hatton*, 4th Dist. No. 09CA4, 2010-Ohio-1245. In affirming the second judgment, the Fourth District Court of Appeals added that Hatton could have raped the victim without leaving DNA, and that the convictions were based on other evidence, including Dunn's testimony. 2010-Ohio-1245 at ¶ 23-25.[4]

---

4. I consider the appellate court's elaboration in this instance to be inappropriate. It is not the role of an appellate court to come up with theories supporting a criminal defendant's guilt that are not reflected in the trial court's decision.

{¶ 47} In support of a 2011 motion for leave to file a motion for a new trial, Hatton submitted correspondence that Dunn had sent to the Innocence Project in 2009, recanting his trial testimony and identifying the second perpetrator as "Jeff Massey." Hatton also submitted a more recent affidavit from Dunn in which he averred that he had falsely identified Hatton rather than Massey as the second perpetrator. Although Hatton included an affidavit from an attorney for the Innocence Project explaining that the organization had not provided Dunn's correspondence to Hatton until December 2010, the trial court concluded that Hatton had failed to justify his delay in filing his motion, and it denied leave. After being instructed by the Fourth District to reach the merits of Hatton's motion, *State v. Hatton*, 4th Dist. Pickaway No. 11CA23, 2013-Ohio-475, the trial court denied the motion without a hearing, finding that Dunn's recantation was not credible and that other unspecified evidence supported Hatton's conviction.

{¶ 48} Hatton's 2019 motion for leave to file a motion for a new trial and his 2019 petition for postconviction relief included a 1998 memo from the state's DNA expert to the county prosecutor that had not previously been disclosed to Hatton. In the memo, the expert admits that the DNA samples from Hatton's trial included DNA from a male other than Hatton or Dunn. Hatton's motion and petition also included police reports from January 1997 that were provided to Hatton in response to his April 2019 public-records request. The reports indicate that the investigating detectives found Dunn to be completely lacking in credibility and that although Dunn had identified Hatton as the second perpetrator, the detectives, after consulting with the county prosecutor, determined that the most they could do with that information was to have Hatton appear in a live lineup. The reports make clear that the detectives and the county prosecutor did not believe that there was adequate evidence at that point to file charges against Hatton. However, one of the reports states that a municipal-court judge had called the police department and demanded that charges be filed against Hatton. One of the

detectives filed criminal complaints against Hatton in the Circleville Municipal Court the same day.

{¶ 49} The trial court denied Hatton's 2019 motion and petition without a hearing. The trial court concluded that Hatton's arguments were barred by res judicata, that there was no new evidence in the case, and that the DNA evidence was not essential to the conviction, because the jury had convicted him "on a plethora of additional evidence."

{¶ 50} When presented with each individual claim or bit of evidence to support Hatton's requests for postconviction review, the trial judge did not deem it necessary to test the veracity of each in light of all the other evidence. But looking at all of Hatton's postconviction efforts together, we now have (1) a statement from one of Dunn's cellmates indicating that Dunn had told him that he had perjured himself during Hatton's trial, (2) an affidavit from a DNA expert indicating that the state's DNA testing procedures were scientifically unacceptable, (3) a recantation by Dunn—the only person who identified Hatton as the second perpetrator and the state's star witness, (4) police reports showing that charges were filed against Hatton only because a judge had insisted that charges be filed and that the detectives and prosecutor who had reviewed the evidence had not believed it was sufficient to charge him, (5) repeated requests by Hatton for DNA testing, (6) unwavering claims of innocence by Hatton, and now (7) a written statement from the state's DNA expert stating that the DNA samples include male DNA that could not have come from Hatton or Dunn. Hatton has not established a right to relief on his claims, but he has presented evidence that *if true* would merit a new trial. The trial court's refusal to hold an evidentiary hearing on Hatton's claims at this point is unreasonable.

{¶ 51} We try to get as close as we can to the truth through the many rules, the many roles, and the many participants involved in jury trials. But after a trial concludes with a verdict, any subsequent arguments regarding the truth-finding

process are made to the trial judge alone. Judges are not exempt from the normal human tendency to interpret new evidence in a way that confirms one's already existing beliefs—known as confirmation bias—and a trial judge who presided over a defendant's trial "cannot help but carry any bias from the original case into the consideration of the post-conviction claim," Frank Tankard, *Tough Ain't Enough: Why District Courts Ignore Tough-on-Paper Standards for a Federal Prisoner's Right to a Hearing and How Specialty Courts Would Fix the Problem*, 79 UMKC L.Rev. 775, 777 (2011). Confirmation bias is not the same as judicial bias, but it poisons judicial decision-making all the same. For this reason, among others, I believe that statewide reforms are in order for postconviction claims of actual innocence.

{¶ 52} In a July 2022 report, the Ohio Task Force on Conviction Integrity and Postconviction Review recommended such reforms to Ohio's postconviction-review process. *Report and Recommendations*, available at https://www.supremecourt.ohio.gov/docs/Boards/CIPR/Report.pdf (accessed Oct. 19, 2022) [https://perma.cc/97RM-THBP]. Among other suggested changes, the task force recommends the creation of an Independent Innocence Inquiry Commission and amendments to the statutes governing postconviction petitions, R.C. 2953.21 and 2953.23. State Representative David Leland recently proposed new legislation to the General Assembly that incorporates these reforms. 2022 H.B. No. 738 (as introduced), chrome-extension://ieepebpjnkhaiioojkepfniodjmjjihl /data/pdf.js/web/viewer.html?file=https%3A%2F%2Fsearch-prod.lis.state.oh.us %2Fsolarapi%2Fv1%2Fgeneral_assembly_134%2Fbills%2Fhb738%2FIN%2F00 %2Fhb738_00_IN%3Fformat%3Dpdf (accessed October 31, 2022); *see also Rep. Leland to introduce bill addressing wrongful convictions* (Oct. 11, 2022), https://ohiohouse.gov/members/david-leland/news/rep-leland-to-introduce-bill-addressing-wrongful-convictions-112149 (accessed Oct. 19, 2022) [https://perma.cc/9W7N-JAQB]. The task force also drafted a proposed criminal

rule, Crim.R. 33.1, which I hope will be advanced for review and consideration by this court's Commission on the Rules of Practice and Procedure. *Report and Recommendations* at 1. It is my sincere hope that this court and the General Assembly give serious consideration to these proposals for reform.

**{¶ 53}** Under these reforms, a petitioner claiming innocence would not need to struggle through multiple layers of review to finally get four or more justices at this court to hold that a nonfrivolous request for postconviction review should proceed to an evidentiary hearing. Instead, a hearing would be required for all nonfrivolous claims of innocence that include evidence that was not proffered during the original proceedings. And if the Independent Innocence Inquiry Commission comes to fruition, a petitioner's claims would not remain solely at the mercy of the adversarial process and a judge who previously presided over the matter. Instead, petitioners would be able to present their claims to an independent truth-seeking body that is not susceptible to confirmation bias and that bears allegiance to nothing other than the truth.

**{¶ 54}** Amending the statutes governing postconviction petitions and adopting Crim.R. 33.1 would ensure for all convicted people claiming innocence the same opportunities for evidentiary hearings and substantive review that the majority is ensuring through this decision for Hatton. I fully join the majority opinion.

BRUNNER, J., concurs in the foregoing opinion.

_____

Judy C. Wolford, Pickaway County Prosecuting Attorney, and Jayme Hartley Fountain, Assistant Prosecuting Attorney, for appellee.

The Behal Law Group, L.L.C., and John M. Gonzales, for appellant.

_____