**[Cite as *State v. Hatton*, 2025-Ohio-5805.]**

IN THE COURT OF APPEALS OF OHIO

FOURTH APPELLATE DISTRICT

State of Ohio,                           :

     Plaintiff-Appellant,         :

                                                  No. 24CA-7
v.                                       :                   (C.P.C. No. 97CR-23)

Martin L. Hatton,                        :            (REGULAR CALENDAR)

     Defendant-Appellee.          :

---

D E C I S I O N

Rendered on December 30, 2025

---

**On brief:** *Judy C. Wolford*, Prosecuting Attorney, and *Jayme Hartley Fountain*, for appellant. **Argued:** *Jayme Hartley Fountain.*

**On brief:** *The Behal Law Group LLC*, and *John M. Gonzales*; *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellee. **Argued:** *Kort Gatterdam.*

---

APPEAL from the Pickaway County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Plaintiff-appellant, State of Ohio, appeals the March 22, 2024 decision of the Pickaway County Court of Common Pleas granting defendant-appellee, Martin L. Hatton, a new trial pursuant to Crim.R. 33(A)(6), and the trial court's April 19, 2024 decision denying the state's motion for reconsideration of that decision.

{¶ 2} On June 5, 1997, Hatton was found guilty by a jury of rape, kidnapping, felonious assault, aggravated burglary, and theft, and was subsequently sentenced to an aggregate term of 39 years incarceration. His conviction was affirmed on direct appeal, *State v. Hatton*, 1999 Ohio App. LEXIS 1864 (4th Dist. Apr. 19, 1999), and the Supreme Court of Ohio did not accept jurisdiction over his direct appeal. *State v. Hatton*, 86 Ohio St.3d 1461 (1999).

{¶ 3}   Hatton has repeatedly challenged his conviction during the intervening years through collateral attack, and those challenges have largely been based on the ambiguity of the initial DNA analysis in his case.  Ultimately, Hatton filed a motion for leave to file a new trial motion based on newly discovered evidence in 2018, over 20 years after his conviction. And in 2022, the Supreme Court ordered the trial court to grant that motion and permit Hatton to file his motion for a new trial.  The court summarized the trial evidence and the newly discovered evidence that allegedly undermined Hatton's conviction as follows:

> The state called [Raman] Tejwani, a criminalist employed by the city of Columbus's crime lab, as an expert witness. The crime lab had received from the Circleville Police Department blood samples from Hatton, Dunn, and J.C.; vaginal swabs and underwear collected from J.C.; and a purported semen stain on a piece of fabric cut by the police from a sweatshirt that Hatton was allegedly wearing on the night of the offenses. The stain from the sweatshirt did not contain enough cells to extract DNA, and no conclusions could be drawn regarding its source. The lab performed a differential extraction of the mixed samples on the vaginal swabs and underwear to separate the female and male fractions, and it used polymerase chain reaction to test the DNA.

> Tejwani testified that the male fractions from the vaginal swabs and underwear "could not give information for the contributor[s]" because they were mixed samples and that she could "neither exclude nor include anybody" as a contributor to those mixed samples. With respect to those mixed samples, the table of test results included in the lab report signed by Tejwani, provided to Hatton's counsel before trial, and admitted as evidence stated only, "Inconclusive."

> During her trial testimony, Tejwani referred to her notes, which the state had not produced to Hatton but which Tejwani agreed to provide to Hatton's attorney at the conclusion of her testimony.

> The next day, Hatton called his own forensic expert, Larry M. Dehus, who had reviewed the lab report and the notes that Tejwani had provided to defense counsel the previous day. He testified that "there was information in the notes that was not included in the report," specifically the presence of a faint B allele in the mixed-sample male DNA fractions at genetic marker D7S8. According to Dehus, the B allele was significant because it could not have come from Hatton, Dunn, or J.C., all of whom had only A alleles at that genetic marker. He therefore

opined that someone other than Hatton and Dunn "was [a] contributor to semen in those samples."

The state neither offered a rebuttal to Dehus's testimony that the mixed samples contained DNA from a male contributor other than Hatton or Dunn nor suggested an alternative source for the additional DNA. In fact, the prosecutor ignored Dehus's testimony about the significance of the B allele altogether, never once mentioning the B allele in his cross-examination of Dehus. Instead, the prosecutor focused almost exclusively on impeaching Dehus's qualifications. In his closing argument, the prosecutor told the jury that Dehus's testimony was no different from Tejwani's testimony—that the DNA test results did not conclusively include or exclude Hatton. But the prosecutor then flatly rejected the defense's argument that someone other than Hatton and Dunn was involved: "There was no third person. It was Ricky Dunn and Marty Hatton inside that residence * * * beyond any reasonable doubt."

. . .

In 2018, in response to a public-records request, Hatton received for the first time a copy of a memo from Tejwani to the county prosecutor. The memo was dated June 22, 1998, a date on which both Hatton's direct appeal and his first petition for postconviction relief were pending. The memo, which Tejwani wrote following a phone conversation she had with Hatton's postconviction counsel, Keith Yeazel, states:

Mr. Yeazel was concerned about the origin of the faint "B" type observed at the D7S8 locus in sample 5 (vaginal swabs, male fraction) as reported in the Crime Lab log, page 3. This type was not observed in the known blood samples of [J.C.], Martin L. Hatton or Ricky D. Dunn. The male fraction of the vaginal swabs consisted of a mixed DNA sample and no information regarding the contributor could be obtained from the DNA typing results which were reported as "inconclusive" in the Lab Report.

In the memo, Tejwani implicitly informed the prosecutor that Hatton's attorney was asking about an element of the DNA test results that she had not included in the lab report or testified about at trial, and she also acknowledged that neither Hatton nor Dunn could have contributed the B allele that was found in the mixed samples, because a B allele was "not observed in the known blood samples." The memo was the first and only acknowledgment in the record by a *state's* witness that the B allele indicated that someone other than Hatton or Dunn had

contributed to the male DNA in the mixed samples. The prosecutor did not disclose the Tejwani memo to Hatton's trial, appellate, or postconviction counsel. And Hatton did not learn of its existence for more than 20 years.

. . .

In 2019, based primarily on his discovery of the Tejwani memo, Hatton filed a motion for leave to file a motion for a new trial and a petition for postconviction relief. Hatton made similar arguments in both filings and requested an evidentiary hearing and a new trial. Hatton argued that the memo contradicted Tejwani's trial testimony that the DNA test results were inconclusive and that the memo demonstrated that the test results excluded him as a contributor to the mixed samples. He also argued that the state's failure to disclose that material, exculpatory information and its presentation of false testimony from Tejwani violated his right to a fair trial. Finally, he preemptively argued that res judicata should not apply, because the Tejwani memo had not been "subject to inclusion or review at any level."

. . .

While the existence of the B allele and its omission from the lab report and Tejwani's trial testimony did permeate Hatton's arguments on direct appeal and in his 1998 petition for postconviction relief, the Tejwani memo does more than simply restate the existence of the B allele and reiterate Tejwani's testimony that the DNA test results were inconclusive. The new information in the memo is the acknowledgment by Tejwani—the *state's* expert witness—that the B allele could not have originated from Hatton or Dunn and that, therefore, DNA from *another male* was present in the mixed samples. That new information creates an obvious hole in the state's narrative that two men entered J.C.'s home, that those two men raped J.C. and left their DNA, and that those two men were Hatton and Dunn. If the male DNA in the mixed samples was wholly contributed by two men, one of whom was Dunn, then Tejwani's acknowledgment of the B allele and its significance would mean that Hatton could not have been the other contributor.

Tejwani's acknowledgment in the memo of the significance of the B allele, which was glaringly absent from both the lab report and her trial testimony, is qualitatively different from bare knowledge of the B allele's presence. Had he been armed with the withheld acknowledgement by the state's own expert,

Hatton could have impeached Tejwani's incomplete testimony and buttressed, if not outrightly confirmed, defense expert Dehus's testimony about the DNA test results, the substance of which the prosecutor essentially ignored. Additionally, had Tejwani's acknowledgement come out at trial, it likely would have compelled the state to offer some explanation for the additional or alternative contributor to the mixed samples, given the state's theory that Dunn and Hatton were the only two offenders. Tejwani's acknowledgment and its potential effect on Hatton's trial have not been, and could not have been, litigated before. Accordingly, we conclude that both the trial court and the court of appeals abused their discretion by applying res judicata to preclude Hatton from arguing for a new trial and postconviction relief based on newly discovered evidence.

(Emphasis in original.) *State v. Hatton*, 2022-Ohio-3991, ¶ 9-25.

{¶ 4} On remand, the case was reassigned to a visiting judge. At that time, the state sought new DNA testing of additional items from the investigation, including Hatton's sweatshirt and the victim's rape kit. The state then sought to have results of those tests and the testimony of the new DNA examiners admitted at the hearing, but on review of cross-motions in limine the visiting judge concluded that no new additional evidence would be presented at the new trial hearing. Rather, the universe of the evidence that the trial court considered in resolving Hatton's new trial motion was limited to the trial transcript, the newly-discovered Tejwani memo, a new recantation affidavit from Hatton's codefendant, and two police witnesses on behalf of the state. (*See* Dec. 18, 2023 Joint Entry on Evidentiary Issues Prior to Hearing on Mot. for New Trial.)[1] But this limitation had significant consequences—specifically, the trial court apparently felt it had no choice but to grant the new trial motion considering the Supreme Court's earlier decision:

Although the defense called its own expert witness who pointed out that neither Hatton or Dunn could have contributed to the mixed sample at the D7S8 locus and that a third male contributor was present in the sample, the Supreme Court emphasized the importance of this information coming from the State's expert witness.

---

[1] The state later claimed it had been forced into agreeing to this evidentiary limitation but did not object to it on the record. (*See* Dec. 19, 2023 Tr. at 4 (agreeing to stipulation that certain evidence would be considered but not specifically objecting to court's decision to refrain from considering new evidence.))

> This newly discovered evidence would have informed a jury that the Defendant was EXCLUDED from the only DNA sample submitted. The DNA results were not inconclusive. There was ANOTHER MALE present in the sample. The State presented no evidence or argument to explain this unknown male. The jury would be left wondering "who is this third male?"
>
> Considering all the evidence at trial and the newly discovered evidence, this Court finds that the new evidence would create a reasonable doubt in the minds of one, more or all of the jurors. The newly discovered evidence establishes a strong probability of a different result at a new trial. The Defendant's Motion for a New Trial is sustained.

(Emphasis in original.) (Mar. 22, 2024 Decision & Entry on Def.'s Mot. for New Trial at 6-7.) The state filed a motion for reconsideration, arguing that the court should have considered testimony regarding the results of the DNA tests of Hatton's sweatshirt and the victim's rape kit prior to making its determination. But the trial court concluded that its hands were tied, and denied that motion:

> [The new DNA results are] not allowable. The State versus Hatton Supreme Court says I am to consider only the newly discovered evidence and the evidence presented at the trial. State versus Dickson, State versus Gillespie basically say the same thing. The newly discovered evidence and statements in the evidence presented at trial. You presented no case in your motion which allows me to consider this evidence.

(Capitalization omitted.) (Apr. 19, 2024 Tr. at 39.) The state filed a motion for leave to appeal the trial court's ruling. We granted the state's motion for leave on February 4, 2025, and the state now asserts a single assignment of error, arguing that the trial court abused its discretion in granting Hatton's motion for new trial.

{¶ 5} Crim.R. 33(A)(6) provides that "[w]hen a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given . . . [and the] prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses." The Supreme Court of Ohio has warned:

> [to] warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered

> evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Petro*, 148 Ohio St. 505 (1947), syllabus. Appellate courts review a trial court's decision to grant or deny a motion for new trial based on newly discovered evidence for an abuse of discretion. *Id.* at 507-508. *See also State v. Chambers*, 2021-Ohio-3388, ¶ 9 (4th Dist.). And a trial court abuses its discretion when its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion is more than a difference in opinion; only when a trial court's judgment is "profoundly and wholly violative of fact and reason that it evidences not the exercise of will but perversity of will not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias" does it constitute an abuse of discretion. *State v. Weaver*, 2022-Ohio-4371. ¶ 24.

{¶ 6} While the trial court's ruling on the new trial motion was not a model of clarity, its decision rested on the understanding that "[t]he DNA results were not inconclusive. There was ANOTHER MALE present in the sample. The State presented no evidence or argument to explain this unknown male. The jury would be left wondering 'who is this third male?' " (Emphasis in original.) (Mar. 22, 2024 Decision & Entry on Def's Mot. for New Trial at 7.) This understanding is in accordance with the Supreme Court of Ohio's opinion on Hatton's motion for leave. *State v. Hatton*, 2022-Ohio-3991, ¶ 36 (observing that the "Tejwani memo illuminated a substantial hole in the state's theory of its case against Hatton, and . . . [he] is entitled to an opportunity to prove at an evidentiary hearing, that the new information contained in the memo, had it been available to him at trial, would likely have resulted in a
different outcome").

{¶ 7} By stating that there was "another" and a "third" male, the court made plain that, despite its earlier statement that "the defendant was EXCLUDED *from the only DNA sample submitted*," it did not improperly and prematurely hold that Hatton was innocent of the offenses for which he was convicted. Rather, the court held that the state had failed

to explain the evidence of a possible third man, who might well have limited Hatton's criminal liability and thereby affected the jury's verdicts.  Furthermore, whether appellant was excluded will be a determination for the jury at the new trial when both the defendant and the state have an opportunity to address the newly discovered evidence with additional evidence.  Accordingly, the court's ruling did not exonerate Hatton but did conclude that Hatton had found a hole in the state's case, and one that the states witness, Tejwani, was both aware of and had concealed from him at the time of trial.

{¶ 8}    Moreover, and most importantly, the state did not point to any evidence at the new trial hearing to establish that this interpretation of the memorandum was incorrect, despite the fact that it has maintained throughout this litigation that it is.  We simply cannot say that granting a motion for new trial under these circumstances without such evidence was an abuse of the trial court's discretion.

{¶ 9}    To be clear, we express no opinion about what the result of a new trial might be, and we are aware of no law that would limit the state from including all relevant and admissible evidence against Hatton at such future proceedings, including the results of the DNA tests of Hatton's sweatshirt and the victim's rape kit.  But given the record before us, we cannot say that the state has established that the trial court's decision to grant a new trial was in error.  Accordingly, the state's sole assignment of error is overruled, and the judgment of the Pickaway County Court of Common Pleas is affirmed.

*Judgment affirmed.*

DORRIAN and EDELSTEIN, JJ., concur.