[Cite as *State v. Stewart*, 2023-Ohio-1150.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 22AP-531 |
| | | (C.P.C. No. 16CR-4807) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Juan A. Stewart, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 6, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee.

**On brief:** *Carpenter Lipps & Leland LLP*, *Kort Gatterdam*, and *Erik P. Henry*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Juan A. Stewart, appeals from an opinion and judgment entry of the Franklin County Court of Common Pleas denying his motion for leave to file a motion for new trial and his motion for new trial. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed September 1, 2016, plaintiff-appellee, State of Ohio, charged Stewart with one count of purposeful murder in violation of R.C. 2903.02(A); one count of felony murder in violation of R.C. 2903.02(B); and one count of having a weapon while under disability in violation of R.C. 2923.13. Both of the murder charges contained accompanying repeat violent offender specifications. Additionally, all three of the charges

contained accompanying firearm specifications.  The charges related to the shooting death of Edward Williams on January 20, 2015.

{¶ 3}    Stewart waived his right to a jury trial on the weapon under disability count and the accompanying firearm specification, as well as the repeat violent offender specifications attached to the murder charges. The matter proceeded to a jury trial in May 2018 on the murder charges and the accompanying firearm specifications.  The May 2018 trial ended with a hung jury on both counts, and the trial court declared a mistrial on those counts.  However, the trial court found Stewart guilty of having a weapon while under disability and the accompanying firearm specification.  The trial court sentenced Stewart to an aggregate prison term of five years, journalizing his conviction and sentence in a June 7, 2018 amended judgment entry.  Stewart appealed the trial court's judgment, and this court affirmed.[1] *State v. Stewart*, 10th Dist. No. 18AP-496, 2020-Ohio-1245 ("*Stewart I*").

{¶ 4}    In August 2019, the trial court conducted a retrial on the two murder charges and the accompanying firearm specifications.  The jury found Stewart guilty on both counts of murder and accompanying firearm specifications, and the trial court found Stewart guilty of the repeat violent offender specifications.  The trial court sentenced Stewart to an aggregate prison term of 22 years to life, journalizing Stewart's convictions and sentence in an August 19, 2019 judgment entry.  Stewart appealed, and this court affirmed.  *State v. Stewart*, 10th Dist. No. 19AP-615, 2020-Ohio-5344 ("*Stewart II*").

{¶ 5}    More than 20 months after this court's decision affirming his murder convictions, on August 1, 2022, Stewart filed a motion for leave to file a motion for new trial and a motion for new trial.  In his motions, Stewart asserted he had newly discovered evidence in the form of an affidavit of a witness from his previous trial recanting her trial testimony and that he was unavoidably prevented from discovering that evidence within the timeframes set forth in Crim.R. 33(B).  The state opposed Stewart's motion for leave and his motion for new trial.

---

[1] Stewart asserted two assignments of error in *Stewart I*, both challenging the imposition of the firearm specification for his conviction of having a weapon while under disability.  This court overruled both of his assignments of error, finding the trial court did not err in sentencing Stewart on the firearm specification and that Stewart did not receive the ineffective assistance of counsel relative to counsel's failure to challenge the imposition of the firearm specification.

{¶ 6}   In an August 22, 2022 opinion and judgment entry, the trial court denied Stewart's motion for leave and motion for new trial without a hearing.  The trial court found that Stewart had not demonstrated, by clear and convincing evidence, that he was unavoidably prevented from discovering the alleged new evidence.   Additionally, the trial court concluded that even if it were to find that Stewart established grounds for leave, he nonetheless failed to establish grounds for a new trial.  Even construing the witnesses' affidavit as true, the trial court determined the alleged new evidence would not change the outcome of the trial.  Thus, the trial court denied Stewart's motion for leave and motion for new trial.  Stewart timely appeals.

## II. Assignment of Error

{¶ 7}   Stewart assigns the following sole assignment of error for our review:

> The trial court erred in denying, without a hearing, appellant's
> motion for leave and motion for new trial.

## III. Analysis

{¶ 8}   In his sole assignment of error, Stewart argues the trial court erred in denying his motion for leave and motion for new trial without a hearing.

{¶ 9}   The decision of whether to grant a new trial, pursuant to Crim.R. 33, rests within the sound discretion of the trial court.  *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus.  An appellate court reviews a trial court's determination of a Crim.R. 33 motion for an abuse of discretion.  *Id*.; *State v. Townsend*, 10th Dist. No. 08AP-371, 2008-Ohio-6518, ¶ 8.  Similarly, an appellate court review's a trial court's ruling on a motion for leave to move for a new trial for an abuse of discretion.  *State v. McNeal*, 169 Ohio St.3d 47, 2022-Ohio-2703, ¶ 13, citing *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993).  An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 10}  Stewart premised his motion for new trial on newly discovered evidence.  A trial court may grant a new trial under Crim.R. 33(A)(6) "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."  The language of Crim.R. 33 makes it clear that a trial court should not grant a new trial " 'unless it affirmatively appears from the record that a

defendant was prejudiced by one of the grounds stated in the rule, or was thereby prevented from having a fair trial.' " *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 41, quoting *Columbus v. Carroll*, 10th Dist. No. 96APC01-90 (Aug. 27, 1996), citing Crim.R. 33(E).

{¶ 11} Additionally, the rule provides a time limit in which a defendant has to file the motion. "Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered." Crim.R. 33(B). Further, "[i]f it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period." Crim.R. 33(B). Thus, "where a defendant seeks to file a motion for new trial beyond the 120-day time limit, Crim.R. 33(B) requires the defendant to first obtain leave before seeking a new trial." *State v. Golden*, 10th Dist. No. 13AP-927, 2014-Ohio-2148, ¶ 9, citing *State v. Graggs*, 10th Dist. No. 13AP-852, 2014-Ohio-1195, ¶ 5. *See also State v. Bethel*, 10th Dist. No. 09AP-924, 2010-Ohio-3837, ¶ 13 (noting "Crim.R. 33(B) contemplates a two-step procedure" in which a defendant must first seek leave to establish he was "unavoidably prevented" from discovering the new evidence, and secondly, only after the trial court makes that finding, the defendant must then file the actual motion for new trial within seven days from the finding).

{¶ 12} In support of both his motion for leave and his motion for new trial, Stewart relies on an affidavit from a witness at his trial, Roberta Turner, recanting her trial testimony. At trial, Turner testified that, on the day of the shooting, she met Stewart at a bar located very near the scene of the shooting and stayed there with him until about 15 minutes before the shooting occurred. Turner now avers her testimony was not truthful and that she was not with Stewart that day. Stewart asserts he was unavoidably prevented from discovering this evidence because he could not have known if or when Turner would ever recant her testimony. However, even if we were to conclude that Stewart could demonstrate Turner's affidavit was newly discovered evidence that he was unavoidably prevented from discovering, we nonetheless conclude the trial court did not abuse its

discretion in denying Stewart's motion for new trial as Turner's recantation would not have changed the outcome of the trial.

{¶ 13} To prevail on a motion for new trial based on newly discovered evidence, the defendant must show that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶ 14} In *Stewart II*, we summarized the evidence presented at Stewart's second trial as follows:

> Roberta Turner, a long-time friend of appellant, often socialized with him at a club Damon Fluellen ran out of his house located at 833 St. Clair Avenue. The club was open all day and night and there were always "lots of people coming and going." (Tr. at 414.) Appellant lived in the neighborhood and, according to Turner, regarded Fluellen as a mentor.
>
> Late in the evening on January 19, 2015, Turner was with appellant at a bar located within a 3 to 4 minute walk from Fluellen's house. Turner left the bar around 11:45 p.m.; appellant remained there. At approximately 12:20 a.m. on January 20, 2015, Turner exchanged several text messages and phone calls with Fluellen, which prompted her to text appellant asking if he was "alright." (Tr. at 403.)
>
> Meanwhile, at approximately 12:12 a.m., Verlie Smith, a COTA bus driver, approached the intersection of 2nd and St. Clair Avenues and heard four gunshots. He observed an African-American man walking away from a truck parked on St. Clair in the area where the gunshots were fired. The man then walked toward two nearby houses. Smith could not see if the man entered one of the houses or walked between them. Almost simultaneously, a car parked in front of the truck drove away. The man Smith had seen walking was not in the car. For safety reasons, Smith sat through three cycles of red lights. He eventually turned onto St. Clair and passed by the truck. Through the open driver's door, he observed a man slumped over in the driver's seat.

Columbus Police Officer Jason Kulp and other officers were dispatched to the scene of the shooting. Kulp described the neighborhood as a "high-crime area" known for drug activity and shootings. (Tr. at 264.) Upon arrival, Kulp observed the victim seated in a truck parked directly across the street from 833 St. Clair. He then observed a man, later identified as Fluellen, standing on the front porch of 833 St. Clair clad only in his underwear. At Kulp's direction, Fluellen re-entered the house. A short time later, Fluellen came back outside, this timely fully clothed. Because Fluellen's behavior seemed suspicious, officers sought and received permission to search his house. The search revealed no evidence linked to the shooting.

The police interviewed Smith, who described the man he saw walking away from the truck as approximately 6 feet tall, weighing between 180 and 200 pounds, wearing a dark jacket and pants and a knit, toboggan-type hat. He did not see a bill on the hat because the man was walking away and had his back to Smith.

At trial, Kulp identified surveillance video obtained from the Milo-Grogan Recreation Center, which is located across the street from the scene of the shooting. The video depicts a car with its headlights on approach and park on the street across from 833 St. Clair. Approximately three minutes later, a truck arrives and parks behind the car. The video then depicts flashes of gunfire near the driver's side of the truck, followed by the shadow of a person walking between the car and the truck. The car then drives away. Very shortly thereafter, a light at the back of 833 St. Clair illuminates, and the back door opens momentarily. The video then depicts a person moving around in the backyard.

Thomas Martin lives on Starr Avenue behind 833 St. Clair. In the early morning hours of January 20, 2015, he observed a police helicopter with its lights illuminated hovering over his house. Ten to fifteen minutes later, he heard the chain-link fence in his backyard rattle; he assumed that someone had jumped over the fence. Later that morning he found a red Chicago Bulls baseball hat on the ground along the fence line. Thinking the person who lost it would likely return for it, he left it there. He retrieved the hat the next day and turned it over to the police.

Detective Suzanne Nissley of the Crime Scene Search Unit identified several photographs taken at the crime scene which depict, among other things, Williams' body inside the truck. The photographs also depict evidence recovered from the scene, including four .40 caliber spent shell casings found in the street and on the sidewalk near Williams' vehicle, as well as a .40 caliber Smith & Wesson semi-automatic handgun (with 1 live round in the chamber and a magazine containing 8 live rounds) found in the brush beside a fence by the alley at the rear of 833 St. Clair.

Matthew White, a firearms examiner with the Bureau of Criminal Investigation ("BCI"), examined and test-fired the recovered weapon, found it to be operable, and determined that the four spent casings and three bullets recovered from the scene (two of which were recovered from Williams' body) had been fired from that weapon.

Timothy Augsback, a BCI forensic scientist, analyzed DNA swabs taken from the firearm, including the trigger, the handled areas (the grip and the slide), the magazine, and the nine live rounds. That analysis revealed that the trigger, the magazine, and the handled areas contained a mixture of DNA, with appellant included as the only major contributor. DNA deposited by the minor contributors was insufficient to test. No DNA profile was obtained from the nine rounds. Augsback also analyzed DNA swabs taken from the baseball hat, which revealed a mixture of DNA, with appellant included as the only major contributor. He acknowledged that it is not possible to determine how or when DNA is deposited on an item; accordingly, he could not definitively state that appellant fired the weapon on January 20, 2015.

Detective James Howe conducted a digital forensic examination and cell-site analysis of appellant's cell phone for the relevant time period. Within minutes of the shooting, appellant both received and sent calls and text messages from the general vicinity where the shooting occurred. Appellant's browser history revealed that after the shooting, he searched a local news website numerous times for information pertaining to the shooting.

Appellant presented the following evidence. Katie Hodge, a friend of appellant, communicated via cell phone with him several times on January 19 and 20, 2015. According to

Hodge, appellant gave no indication during these communications that he was involved in Williams' shooting.

Jakita Smith-Goolsby, the mother of appellant's children, averred that appellant grew up in the Milo-Grogan area and lived there with his mother on January 20, 2015. He had many friends in the area with whom he often shared clothing items, including his vast collection of hats. She spoke with appellant by cell phone minutes before and after the shooting. She found nothing odd about their conversations; indeed, appellant was breathing normally and otherwise gave her no reason to believe that anything unusual had happened. She was shocked to later learn that appellant had been charged with Williams' murder.

In addition to the testimony and exhibits presented, the parties entered into numerous stipulations. (State's Ex. GG.) Many of the stipulations confirmed the accuracy of evidence submitted by the state, including the events depicted on various surveillance videos (State's Ex. K, J, and L), records from appellant's cell phone (State's Ex. Q, Q1, Q2a and Q3a), records from Turner's cell phone (State's Ex. CC), records from Williams' cell phone (State's Ex. P1), aerial photographs of the crime scene (State's Ex. I), autopsy photographs and findings of Franklin County Deputy Coroner Dr. Kenneth Gerston (State's Ex. B11, B14, B17, B20, B29, and U), a photograph of Williams (State's Ex. V), still images of appellant taken from the cell phone video recorded on November 9, 2014 (State's Ex. Y, Y1, Y2, and Y3), photographs of appellant (Def. Ex. 1A through 1RR), and photographs depicting the location and condition of the firearm when recovered from the alley and fence line behind 833 St. Clair shortly after the homicide (State's Ex. A38, A39, A40, and A41.) The stipulations also included chain-of-evidence information related to the baseball hat (State's Ex. S1), DNA standards and submissions from Williams and appellant, and information regarding recovery and submission of the firearm and ammunition (State's Ex. M and N3b).

(Footnotes omitted.) *Id.* at ¶ 5-18. The parties agree that Turner's testimony from the first trial was consistent with her testimony from the second trial.

{¶ 15} In both his motion for leave and his motion for new trial, the alleged "new evidence" Stewart relies on is Turner's affidavit recanting her testimony from Stewart's trials. More specifically, in her affidavit that Stewart filed in support of his motions, Turner

avers that she did not testify truthfully when she placed Stewart at the Happy Family Bar on the night of the shooting. Despite Turner's testimony to the contrary at both Stewart's first and second trials, Turner now avers she did not meet Stewart at the Happy Family Bar at any time during the day or night of the shooting and that she had no contact with Stewart after 3:00 p.m.

{¶ 16} "Recantation by a significant witness does not, as a matter of law, entitle the defendant to a new trial." *State v. Woodward*, 10th Dist. No. 08AP-1015, 2009-Ohio-4213, ¶ 20, citing *State v. Walker*, 101 Ohio App.3d 433, 435 (8th Dist.1995). Instead, the pertinent inquiry is whether the new testimony, if credible, would materially affect the outcome of the trial. *Id*. at ¶ 20, citing *State v. Burke*, 10th Dist. No. 06AP-686, 2007-Ohio-1810, ¶ 18.

{¶ 17} As the trial court noted, even construing Turner's affidavit as credible, Turner's new testimony does not disclose a strong probability of a different outcome at a new trial. Turner's original trial testimony placing Stewart near the murder scene was cumulative to other evidence presented at trial linking Stewart to the shooting, including Stewart's DNA on the murder weapon, his DNA on a baseball cap found near the crime scene, cell phone evidence from Stewart's phone establishing Stewart was at or near the scene of the shooting, and searches on Stewart's phone for media coverage of the shooting before the murder had been reported to the media. Turner's new testimony through her affidavit does not contradict any of this evidence linking Stewart to the crime. At best, Turner's affidavit demonstrates she did not know where Stewart was on the day of the shooting. Thus, we agree with the trial court that even if Turner's affidavit was considered to be credible, it would not have any effect on the outcome of the trial. Accordingly, the trial court did not abuse its discretion in denying Stewart's motion for new trial.

{¶ 18} Finally, to the extent Stewart argues the trial court should have held a hearing before ruling on his motion for new trial, we note that Crim.R. 33 does not, by its terms, require a hearing on a motion for new trial. Thus, the decision whether to conduct a hearing on a motion for new trial is left to the sound discretion of the trial court. *See, e.g., State v. Cannon*, 8th Dist. No. 103298, 2016-Ohio-3173, ¶ 16, citing *State v. Smith*, 30 Ohio App.3d 138, 139 (9th Dist.1986); *State v. Hatton*, ___ Ohio St.3d ___, 2022-Ohio-3991, ¶ 28 (a defendant is entitled to an evidentiary hearing only "when the allegations in the motion

demonstrate substantive grounds for relief"), citing *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999). We have already determined that, even construing Turner's affidavit as credible, Stewart's motion does not create a strong probability of a different result at trial given the ample other evidence demonstrating his guilt that Turner's affidavit does not purport to contradict. Stewart does not articulate how an evidentiary hearing would have been anything other than futile. Therefore, we conclude the trial court did not abuse its discretion in denying Stewart's motion for new trial without a hearing.

{¶ 19} For these reasons, we overrule Stewart's sole assignment of error.

## IV. Disposition

{¶ 20} Based on the foregoing reasons, the trial court did not abuse its discretion in denying Stewart's motion for leave to file a motion for new trial and his motion for new trial based on newly discovered evidence without a hearing. Having overruled Stewart's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, P.J., AND MENTEL, J., concur.